## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

PAUL D. FULLER, LEON EGOZI, NEIL CERVENAN, PHILIP M. DURHAM, and LANGDON SIMKINS, individually and as representatives of a class of participants and beneficiaries on behalf of THE FORD MOTOR COMPANY SAVINGS AND STOCK INVESTMENT PLAN FOR SALARIED EMPLOYEES and THE FORD MOTOR COMPANY TAX-EFFICIENT SAVINGS PLAN FOR HOURLY EMPLOYEES,

   *Plaintiffs*,

  v.

FORD MOTOR COMPANY, THE SAVINGS AND STOCK INVESTMENT PLAN ADMINISTRATION COMMITTEE, THE FORD MOTOR COMPANY TAX-EFFICIENT SAVINGS PLAN ADMINISTRATION COMMITTEE, KIERSTEN ROBINSON, JENNIFER WALDO, TIMOTHY STONE, JOHN LAWLER, SHERRY HOUSE, BRADLEY M. GAYTON, JOHN F. MELLEN, STEVEN P. CROLEY, and JOHN DOES 1–10,

   *Defendants*.

Civil Action No. 2:26-cv-11541

**CLASS ACTION COMPLAINT**
JURY TRIAL DEMANDED

1. Plaintiffs Paul D. Fuller, Leon Egozi, Neil Cervenan, Philip M. Durham, and Langdon Simkins ("Plaintiffs"), individually and as representatives of

a classes of participants and beneficiaries of the Ford Motor Company Savings and Stock Investment Plan for Salaried Employees ("Salary Plan") and the Ford Motor Company Tax-Efficient Savings Plan for Hourly Employees ("Hourly Plan") (collectively referred to as the "Plans"), bring this action under 29 U.S.C. § 1132(a)(2) and (a)(3) against Defendants Ford Motor Company ("Ford" or "Company"), the Savings and Stock Investment Plan Administration Committee, the Ford Motor Company Tax-Efficient Savings Plan Administration Committee, Kiersten Robinson, Jennifer Waldo, Timothy Stone, John Lawler, Sherry House, Bradley M. Gayton, John F. Mellen, Steven P. Croley, and John Does 1–10 (collectively referred to herein as "Defendants"), for breaches of fiduciary duty and other violations of the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001–1461 ("ERISA").[1]

2.     To remedy these fiduciary breaches, Plaintiffs bring this action to enforce Defendants' personal liability under 29 U.S.C. § 1109(a) to make good to the Plans all losses resulting from each breach of fiduciary duty and to restore to the Plans Defendants' profits made through their unlawful use of Plan participants' retirement savings. Plaintiffs seek to enjoin any act or practice that violates ERISA or the terms of the Plans and "other appropriate equitable relief" to redress "any act

---

[1] As conceded by Ford, "[i]f the fiduciaries misuse a plan's money … you may seek help from the U.S. Department of Labor or file suit in a federal court." Salary Plan Summary Plan Description, Jan. 1, 2025.

2

or practice" that violates ERISA. 29 U.S.C. § 1132(a)(3); 29 U.S.C. § 1109(a). As explained in detail below, by unlawfully charging Plan administrative expenses to Plan participants' retirement savings in violation of ERISA, causing the Plans to pay unreasonable compensation to the Plans' recordkeeper and managed account provider, and failing to timely provide all statutorily required information governing the operation and administration of the Plans, Defendants engaged in and continue to engage in conduct that must be redressed and enjoined.

## JURISDICTION AND VENUE

3.     **Subject-matter jurisdiction.** This Court has exclusive jurisdiction over the subject matter of this action under 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331 because it is an action under 29 U.S.C. § 1132(a)(2) and (a)(3).

4.     **Venue.** This District is the proper venue for this action under 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b) because it is the district where at least one of the alleged breaches took place and where at least one defendant resides, may be found, or regularly transacts business in-person.

5.     **Standing.** An action under § 1132(a)(2) allows recovery only for a plan and does not provide a remedy for individual injuries distinct from plan injuries. *LaRue v. DeWolff, Boberg & Assocs., Inc.*, 552 U.S. 248, 256 (2008). A plan is the victim of any fiduciary breach and the recipient of any recovery. *Id.* at 254. Plan participants have individual accounts which are harmed when the Plans are harmed.

3

Section 1132(a)(2) authorizes any participant, fiduciary, or the Secretary of Labor to sue derivatively as a representative of a plan to seek relief on behalf of the plan. 29 U.S.C. § 1132(a)(2). As explained in detail below, the Plans suffered millions of dollars in losses resulting from Defendants' fiduciary breaches, and those injuries may be redressed by a judgment of this Court in favor of Plaintiffs on behalf of the Plans.

6.     To the extent Plaintiffs must also show individual injuries, Plaintiffs have suffered such injuries from being subjected to the fiduciary breaches alleged herein, including by having improper and/or a greater amount of fees deducted from their Plan accounts. These fees would not have been incurred but for Defendants' misconduct and self-dealing, thereby reducing the value of Plaintiffs' retirement assets. Because Plaintiffs had their retirement benefits diminished by unlawful or unreasonable fees paid to service providers, Plaintiffs' retirement assets are less valuable.

## PARTIES

### I.     Plaintiffs

7.     Paul D. Fuller resides in Temperance, Michigan, and is a participant in the Hourly Plan within the meaning of 29 U.S.C. § 1002(7). Mr. Fuller was employed by Ford from approximately 1987 to 2020 as a Specialist. He began

4

participating in the Hourly Plan in approximately 1988 and remains an active participant in that Plan. He also enrolled in the Plans' managed account services.

8. Leon Egozi resides in Ocala, Florida, and is a participant in the Salary Plan within the meaning of 29 U.S.C. § 1002(7). Mr. Egozi was employed by Ford from 1985 to 2007, and again from 2010 to 2022 as a Production Manager. He began participating in the Salary Plan in approximately 1987 and remains an active participant in that Plan.

9. Neil Cervenan resides in Livonia, Michigan, and is a participant in the Salary Plan within the meaning of 29 U.S.C. § 1002(7). Mr. Cervenan was employed by Ford from approximately 1989 to 2022 as an Automotive Safety Engineer. He began participating in the Salary Plan immediately upon his employment and remained an active participant until approximately 2024.

10. Philip M. Durham resides in Canton, Michigan, and is a participant in both the Salary Plan and the Hourly Plan within the meaning of 29 U.S.C. § 1002(7). Mr. Durham was employed by Ford from approximately 1995 to 2025 as the Director of North American Quality. He began participating in the Salary Plan and Hourly Plan immediately upon his employment and remains an active participant in both Plans.

11. Langdon Simkins resides in Springfield, Missouri, and is a participant in the Salary Plan within the meaning of 29 U.S.C. § 1002(7). Mr. Simkins was

employed by Ford from January 2021 to April 2025 as a Field Service Engineer. He began participating in the Salary Plan immediately upon his employment and remains an active participant in that Plan.

## II.  Defendants

12. Ford (NYSE: F) is an American multinational automobile manufacturer incorporated under Delaware law, with its principal place of business in Dearborn, Michigan. As of December 31, 2025, Ford had approximately 169,000 employees worldwide, and reported over $187 billion in revenue.

13. Ford is the Plan sponsor under 29 U.S.C. § 1002(16)(B) and Plan administrator under 29 U.S.C. § 1002(16)(A) for the Plans. Since 2015, if not earlier, Ford also served as the "sole named fiduciary" with respect to the Plans under 29 U.S.C. § 1102(a)(2) with authority to control and manage the operation and administration of the Plans. Ford served in these roles throughout the class period. Apart from its status as the sole named fiduciary, as alleged herein, Ford exercised discretionary authority or discretionary control over the administration and management of the Plans, exercised authority or control over the management or disposition of the Plans' assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plans and, accordingly, was a fiduciary to the Plans under 29 U.S.C. § 1002(21)(A)(i) and (iii).

14.     The Savings and Stock Investment Plan Administration Committee was delegated power and discretionary authority to administer the Salary Plan. The Ford Motor Company Tax-Efficient Savings Plan Administration Committee was delegated the same fiduciary responsibility over the Hourly Plan. The Hourly Plan refers to this committee as "the Committee." For purposes of this complaint, these committees are collectively referred to as the "Administration Committee."

15.     As alleged herein, the Administration Committee exercised discretionary authority or discretionary control over the administration and management of the Plans, exercised authority or control over the management or disposition of the Plans' assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plans and, accordingly, was a fiduciary to the Plans under 29 U.S.C. § 1002(21)(A)(i) and (iii).

16.     The Plans designate certain officers and executives of Ford, and acting on behalf of Ford, to carry out certain fiduciary responsibilities over the administration of the Plans. Ford's Chief Human Resources Officer (nka Chief People and Employee Experience Officer), Chief Financial Officer ("CFO") and General Counsel have the authority, on behalf of Ford, to appoint and remove trustees and investment managers under the Plans (except as to the Ford Stock Fund). Likewise, Ford's Chief Human Resources Officer and CFO are designated to carry out Ford's responsibilities with respect to the Plans, including, without limitation,

7

appointment and removal of service providers used in connection with the Plans and designation of members of the Administration Committee.

17. Defendants Kiersten Robinson served as Ford's Chief Human Resources Officer from April 2018 to April 2022, and Jennifer Waldo served in that position from April 2022 to the present.

18. Defendants Timothy Stone served as Ford's CFO from June 2019 to October 2020, John Lawler served in that position from October 2020 to February 2025, and Sherry House from February 2025 to the present.

19. Defendants Bradley M. Gayton served as Ford's General Counsel from June 2017 to August 2020, John F. Mellen served in that position from August 2020 to July 2021, and Steven P. Croley from July 2021 to the present.

20. As alleged herein, Ford's Chief Human Resources Officer (*i.e.*, Mmes. Robinson and Waldo), CFO (*i.e.*, Messrs. Stone and Lawler and Ms. House), and General Counsel (Messrs. Gayton, Mellen, and Croley), acting on behalf of Ford, exercised discretionary authority or discretionary control over the administration and management of the Plans, exercised authority or control over the management or disposition of the Plans' assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plans and, accordingly, were fiduciaries to the Plans under 29 U.S.C. § 1002(21)(A)(i) and (iii).

8

21.     John Does 1–10 are unknown employees, agents, and/or delegates of Ford who exercised discretionary authority or discretionary control over the administration and management of the Plans, exercised authority or control over the administration, management or disposition of Plan assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plans and, accordingly, were fiduciaries to the Plan under 29 U.S.C. § 1002(21)(A)(i) and (iii). Plaintiffs will seek leave to amend the Complaint to name each of these John Does once they ascertain their identities. They are referred to herein within the definition of Ford.

<strong>ERISA'S FIDUCIARY STANDARDS</strong>

22.     The Plans are defined contribution, individual account employee pension benefit plans under 29 U.S.C. § 1002(2)(A) and § 1002(34). The Plans provide "for an individual account for each participant and for benefits based solely upon the amount contributed to the participant's account, and any income, expenses, gains and losses, and any forfeitures of accounts of other participants which may be allocated to such participant's account." 29 U.S.C. § 1002(34). As qualified retirement plans, the Plans are governed by ERISA.

23.     ERISA imposes strict fiduciary duties of loyalty and prudence upon the Defendants as fiduciaries of the Plan. 29 U.S.C. § 1104(a), states, in relevant part, that:

9

> **[A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants** and beneficiaries and –
>
> > (A)    for the exclusive purpose of
> >
> > > (i) providing benefits to participants and their beneficiaries; and
> > > (ii) defraying reasonable expenses of administering the plan;
> >
> > (B)    **with the care, skill, prudence, and diligence under the circumstances then prevailing** that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.
> >
> > [and]
> >
> > (D)    **in accordance with the documents and instruments governing the plan** insofar as such documents and instruments are consistent with the provisions of this subchapter and subchapter III.
>
> (emphasis added).

24.    As emphasized above, and central to the claims asserted herein, a fiduciary *must* act in accordance with adopted documents governing the plan, and failure to do so is a violation of ERISA. 29 U.S.C. § 1105(a)(1)(D).

25.    Under ERISA, fiduciaries that exercise any authority or control over plan assets or the administration of plan must act prudently and for the *exclusive* benefit of participants in the plan. Fiduciaries cannot act for the benefit of themselves and must ensure that the amount of fees paid from plan assets is no more than

reasonable. 29 U.S.C. § 1104(a)(1)(A)(ii); *see also* 29 U.S.C. § 1103(c)(1) (plan assets "shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan").

26.     Supplementing these general fiduciary duties, certain transactions are prohibited per se by 29 U.S.C. § 1106 because they entail a high potential for abuse. Section 1106(a)(1) states, in pertinent part, that the fiduciary

> shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect –
>
> > (C) furnishing of goods, services, or facilities between the plan and party in interest; [or]
> > (D) transfer to, or use by or for the benefit of a party in interest, of any assets of the plan[.]

27.     Under 29 U.S.C. § 1106(b), fiduciaries are prohibited from engaging in self-dealing with plan assets. Section 1106(b) provides that the fiduciary

> shall not—
>
> > (1) deal with the assets of the plan in his own interest or for his own account,
> > (2) in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries, or
> > (3) receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan[.]

28. "Section [1106](b) prohibits a plan fiduciary from engaging in various forms of self-dealing. Its purpose is to 'prevent[] a fiduciary from being put in a position where he has dual loyalties and, therefore, he cannot act exclusively for the benefit of a plan's participants and beneficiaries.'" *Reich v. Compton*, 57 F.3d 270, 287 (3d Cir. 1995) (Alito, J., quoting H.R. Rep. No. 93-1280 (1974)); *see also* 29 C.F.R. § 2550.408b-2(e)(1).

29. The DOL explains in 29 C.F.R. § 2550.408b-2(e)(1):

> These prohibitions are imposed upon fiduciaries to deter them from exercising the authority, control, or responsibility which makes such persons fiduciaries when they have interests which may conflict with the interests of the plans for which they act. In such cases, the fiduciaries have interests in the transactions which may affect the exercise of their best judgment as fiduciaries.

30. ERISA also imposes explicit co-fiduciary liabilities on plan fiduciaries. 29 U.S.C. § 1105(a) provides a cause of action against a fiduciary for knowingly participating in a breach by another fiduciary and knowingly failing to cure any breach of duty. The statute states, in relevant part, that:

> In addition to any liability which he may have under any other provisions of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:
>
> (1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach;

(2)     if, by his failure to comply with section 1104(a)(1) of this title in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or

(3)     if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

## FACTS APPLICABLE TO ALL COUNTS

### I.     The impact of fees on defined contribution plans

31.     "Defined contribution plans dominate the retirement plan scene today." *LaRue*, 552 U.S. at 255. In the private sector, such plans have largely replaced the defined benefit pension plans that were America's retirement system when ERISA was enacted in 1974. The consulting firm Towers Watson studied Fortune 100 companies from 1985 to 2012 and found that the type of retirement plan offered by the companies has essentially flipped over the last three decades.[2] The survey found that whereas in 1985, 89 of the Fortune 100 companies offered a traditional defined benefit plan, in 2012, only 11 of those companies offered defined benefit plans to newly hired employees. In short, defined contribution plans have become America's retirement system.

32.     A fundamental difference between traditional pension plans and defined contribution plans is that in the former, the employer's assets are at risk.

---

[2] Towers Watson, *Retirement Plan Types of Fortune 100 Companies in 2012*, Towers Watson Research Insider (Oct. 2012).

13

Because the employer is responsible for funding the pension plan to satisfy its commitments to employees, it bears all investment risks. In a defined contribution plan, the employees and retirees bear all investment risks.

33.     Each participant in a defined contribution plan has an individual account and directs plan contributions, both from the participant and from the matching contribution of her employer, into one or more investment alternatives in a lineup chosen by the plan's fiduciaries.

34.     "[P]articipants' retirement benefits are limited to the value of their own individual investment accounts, which is determined by the market performance of employee and employer contributions, less expenses." *Tibble v. Edison Int'l*, 575 U.S. 523, 525 (2015) (handled by undersigned counsel). Expenses, such as those for plan administration, "can sometimes significantly reduce the value of an account in a defined-contribution plan." *Id.*

35.     All qualified retirement plans require plan administration services and the plan's fiduciaries are responsible for hiring those service providers. Those service providers include recordkeepers, trustees, legal counsel, and auditors, among others.

36.     Negotiating and approving those service providers' fees, the reasonableness of same, and the source of payments for those services are fiduciary actions.

37.     Under ERISA, as set forth above, fiduciaries must ensure that plan expenses are paid in accordance with the adopted documents governing the plan and, if paid from the plan's assets, ensure that those fees paid by the plan are reasonable.

38.     These fiduciary decisions have the potential to dramatically affect the amount of money that participants are able to save for retirement. According to the U.S. Department of Labor, a 1% difference in fees over the course of a 35-year career makes a difference of *28%* in savings at retirement.[3] Over a 40-year career, this difference in fees can reduce a participant's retirement savings by almost $500,000.[4]

39.     The entities that provide services to the Plans have an incentive to maximize their fees by collecting the highest amount possible for recordkeeping and managed account services. Thus, it is up to Defendants to protect Plan participants by ensuring that fees are appropriate and reasonable. This is critical because, for each additional dollar in fees paid to a service provider, Plan participants' retirement savings are directly reduced by the same amount, and participants lose the potential for those lost assets to grow over the remainder of their careers. Accordingly, Plan participants' retirement security is directly affected by the diligence used by Plan

---

[3] U.S. Dept of Labor, *A Look at 401(k) Plan Fees*, at 2 (Sept. 2019), https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf,                archived                at https://perma.cc/NCH2-T7H5.

[4] Michael Bird, *Pandemic Highlights Reasons for Reviewing Plan Fees*, PlanSponsor (May 15, 2020), https://www.plansponsor.com/pandemic-highlights-reasons-reviewing-plan-fees/, archived at https://perma.cc/8VCU-E7PC.

fiduciaries to control, negotiate, and reduce the Plans' fees, and to safeguard Plan assets.

40. ERISA fiduciaries of defined contribution plans must engage in a rigorous process to control these costs and ensure that participants only pay those expenses that are allowed and no more than a reasonable level of those allowable fees.

41. Plan fiduciaries must be cognizant of providers' self-interest in maximizing fees and cannot simply accede to the providers' desires and recommendations for the Plan – *e.g.*, managed account services that will maximize the provider's fees – without negotiating or considering alternatives. In order to act in the exclusive interest of participants and not in the service providers' interest, Plan fiduciaries must negotiate as if their own money is at stake.

## II. The Plans

### A. Background

42. The Salary Plan is established and maintained under a written document in accordance with 29 U.S.C. § 1102(a)(1) restated on December 31, 2024.

43. The Hourly Plan is established and maintained under a written document in accordance with 29 U.S.C. § 1102(a)(1) restated on December 31, 2023.

44. In accordance with 29 U.S.C. § 1103(a), the assets of the Plans are held in the Ford Defined Contribution Plans Master Trust ("Master Trust"). No other plans' assets are held in the Master Trust.

45. The Plans are in the top 1/10th of 1 percent (0.01%) of the largest defined contribution plans in the United States. Together, as of December 31, 2020, the Plans had close to 130,000 active participants, and over $20 billion in total net assets. As of December 31, 2024, the Plans had close to 140,000 active participants, and over $25 billion in total net assets.

**B.   Contributions and forfeited Plan assets**

46. Under the Plans, participants are responsible for investing in their individual accounts and will receive in retirement only the current value of that account, which will depend on wage withholdings from employees' compensation, employer matching contributions, and on the performance of investment options net of fees and expenses.

47. Throughout the class period, the Plans have been funded by a combination of participant contributions (or wage withholdings) and Ford's employer matching contributions, each of which are deposited in the Plans' Master Trust account and allocated to individual participant accounts. The Plans provide that Ford shall provide the aggregate amount of matching contributions in cash to

the trustee each payroll period as soon as practicable. Once deposited, these participant and employer contributions become Plan assets.

48.     Under the terms of the Salary Plan, Ford makes discretionary matching contributions at a rate of $0.90 for each dollar contributed of up to 5% of a participant's base salary.

49.     Under the terms of the Hourly Plan, Ford makes discretionary matching contributions to eligible employees at a rate of $1 per hour of up to 2,080 hours annually.

50.     Participants' contributions immediately vest, along with any income or losses on those balances. Ford's contributions, and any income or losses on those balances, vest three years after the participant's original hire date.

51.     If a participant's employment with Ford terminates prior to Ford's contributions fully vesting, the balance of any unvested Ford matching contributions (not the employee's contributions) in the participant's individual account is forfeited by the participant. Although these Ford contributions are forfeited by the Plans' participant, the assets in that individual's forfeited account are transferred to the Plans' forfeiture account and remain Plan assets. These assets are referred to herein as "**Plan Forfeitures**." As with any Plan assets, Ford has a continuing duty to monitor and administer them in accordance with the Plans and ERISA.

52.     On average, between 2020 and 2024, over 1,000 participants in the Plans terminated their employment with Ford annually with accrued benefits contributed by Ford that were less than 100% vested. Between 2010 and 2022, the average amount in a 401(k) forfeiture account was $2,148.[5] Based on the reported average of a forfeited account balance and the number of forfeited accounts in the Plans, the Plans generated between $2.7 and $6.8 million annually in Plan Forfeitures.

### C.   Administrative services provided to the Plans

53.     During the relevant time period at issue in this action, Defendants selected the following providers to provide administrative services to the Plans:

- State Street Bank and Trust Company ("State Street") and Newport Trust Company ("Newport") provided trustee services;

- Alight Solutions, LLC ("Alight") provided recordkeeping services; and

- Financial Engines, Inc. ("Financial Engines") provided online investment advice and fee-based professional management for Plan participants, referred to as managed account services.

---

[5] Guillermo Carranza, et al., *Retention or Regressivity? The Empirical Effects of 401(k) Vesting Schedules* (October 2025), available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4876231, archived at https://perma.cc/CU4W-FFR3.

54. Other service providers included those providing legal services, such as Paul Hastings, LLP ("Paul Hastings") and auditing services such as BDO USA, P.C. ("BDO").

### D. Requirements for payment of administrative services

55. Since at least 2015, and likely earlier, the documents governing both the Salary Plan and the Hourly Plan, all drafted by Ford, expressly mandated that administration expenses, including trustee fees, recordkeeping fees, disbursement fees, legal fees, and audit fees, be paid by the Company (*i.e.*, Ford Motor Company) or from Plan Forfeitures. The unambiguous language is the following:

> Other expenses of administration of the Plan, including, without limitation, Trustee fees, recordkeeping fees, disbursement fees, legal fees, and audit fees, **shall be paid by the Company** in accordance with any applicable agreements, **or** the Company may direct the Trustee to pay any of such other expenses of administration of the Plan from amounts that have been forfeited at any time[.]

Salary Plan § 11.8 and Hourly Plan § XX (emphasis added).

56. From 2020 to 2025, the Summary Plan Descriptions for the Hourly and Salary Plans described the payment of administrative expenses consistent with the Plan document language quoted above, stating that "[g]enerally, administrative, recordkeeping and other expenses incurred by the [Plans] are paid by the Company or from forfeitures or other non-participant [Plan] assets." This means that any administrative expenses must be paid by either Ford or from Plan Forfeitures, and

20

not from any other assets of the Plan, including Plan participants' retirement assets, which are referred to herein as "**Non-Forfeiture Plan Assets**."

57.     Ford consistently represented in fee disclosures that "[t]he Plans are charged fees for trustee, legal, recordkeeping, and accounting services. **At this time, these expenses are paid by Ford Motor Company**." (emphasis added).

58.     As set forth below, and despite the mandatory Plan language and Ford's representations, Ford consistently and improperly used Non-Forfeiture Plan Assets to pay administrative expenses, instead of paying these expenses itself or from Plan Forfeitures.

### III.     Defendants violated ERISA by consistently using Non-Forfeiture Plan Assets to pay administrative expenses.

59.     The U.S. Department of Labor ("DOL"), Internal Revenue Service, and the Pension Benefit Guaranty Corporation developed the Form 5500 for sponsors of employee benefit plans to satisfy their annual reporting requirements under ERISA.[6]

60.     Among other required parts of the Form 5500, Schedule C of the Form 5500 requires the plan sponsor to report information on service providers who received $5,000 or more in total direct and/or indirect compensation **from the plan's assets** for services rendered to the plan, including their relationship to the employer

---

[6] Employee Benefits Security Administration, *Form 5500 Series,* available at https://www.dol.gov/agencies/ebsa/employers-and-advisers/plan-administration-and-compliance/reporting-and-filing/form-5500,                archived                at https://perma.cc/H2DT-E3ZQ.

and compensation details, such as the amount of compensation.[7] "Payments made by the plan sponsor, which are not reimbursed by the plan, are not subject to Schedule C reporting requirements even if the sponsor is paying for services rendered to the plan."[8]

61.     From 2020 to 2024 and likely beyond, and despite the mandatory Plan document language requiring Ford or Plan Forfeitures to pay all administrative expenses, and with insufficient Plan Forfeitures to pay the entirety of these administrative expenses, Ford's Form 5500 Schedule C of the Master Trust reported that Non-Forfeiture Plan Assets were repeatedly and consistently used to pay expenses of administration, including trustee services, recordkeeping services, legal services, accounting services, and administrative services associated with the provision of managed account services.

---

[7]     Instructions for Form 5500, at 26, available at https://www.dol.gov/sites/dolgov/files/ebsa/employers-and-advisers/plan-administration-and-compliance/reporting-and-filing/form-5500/2025-instructions.pdf, archived at https://perma.cc/2LN6-DZK7.

[8] *Id.* at 27.

| Schedule C | 2020 | 2021 | 2022 | 2023 | 2024 | 5-Year Total |
|---|---|---|---|---|---|---|
| Financial Engines (Managed Account Services) | $11,747,339 | $14,555,905 | $14,444,272 | $14,079,891 | $15,602,037 | $70,429,444 |
| Alight (Recordkeeper) | $3,741,318 | $3,385,638 | $4,343,418 | $4,893,253 | $4,574,106 | $20,937,733 |
| State Street Bank and Trust (Trustee) | $756,472 | $781,561 | $568,750 | $644,417 | $969,383 | $3,720,583 |
| Newport Trust Company (Trustee) | $1,000,000 | $950,000 | $900,000 | $900,000 | $850,000 | $4,600,000 |
| Paul Hastings (Legal) | $21,974 | $8,080 |  | $14,239 | $16,205 | $60,498 |
| BDO (Audit) | $80,500 | $75,500 | $110,200 | $142,375 | $111,700 | $520,275 |
| Total | $17,347,603 | $19,756,684 | $20,366,640 | $20,674,175 | $22,123,431 | $100,268,533 |

62. Further evidencing these improper payments, the Salary Plan transferred $13,370,811 from its assets to the Master Trust for the payment of administrative expenses in 2023 alone, per its ERISA-required Summary Annual Report. Similarly, the Summary Annual Report for the Hourly Plan transferred $7,631,233 to the Master Trust for the payment of administrative expenses in 2023. As shown in the above-referenced table, for 2023, the total administrative expenses paid by the Plans substantially exceeded the total amount of Plan Forfeitures. The same is true for every other year during the class period.

63. Accordingly, contrary to Ford's express representations that administrative fees were "paid by Ford Motor Company," and in direct violation of

23

the terms of the Plans, which require Ford or Plan Forfeitures to pay Plan administrative expenses, including, without limitation, trustee fees, recordkeeping fees, disbursement fees, legal fees, and audit fees, Non-Forfeiture Plan Assets were used to pay these expenses during the class period.

64.     If Defendants had followed the mandatory terms of the Plans, Non-Forfeiture Plan Assets would not have been unlawfully used to pay administrative expenses. This practice significantly harmed the Plans, their participants and beneficiaries, and resulted in an improper benefit to Ford. By violating their duty to act prudently, loyally, and *solely* in the interest of Plan participants and beneficiaries, Defendants caused Plan participants' retirement savings to be reduced to pay for administrative expenses, thereby reducing the retirement assets of Plan participants.

65.     Through their exercise of discretion and control over Plan assets, Defendants consistently acted to serve Ford's interest at the expense and to the detriment of the Plans and Plan participants. These violations have occurred since at least 2015, despite the obligatory language relating to the payment of administrative expenses, with no indication that Defendants considered any other source of payment for these substantial expenses other than Non-Forfeiture Plan Assets of their employees and retirees.

66.     The Plans' losses can be determined based on the total amount of Non-Forfeiture Plan Assets that were used to pay administrative expenses. From 2020 to

24

2024, and accounting for lost investment opportunity using an S&P 500 index fund to the present, the Plans' losses are in excess of $100 million. The Plans' losses are continuing.

**IV.      Defendants caused the Plans to pay unreasonable compensation to the Plans' recordkeeper, Alight.**

### A.      Recordkeeping services and fees

67.      Recordkeeping is a service necessary for every defined contribution plan. The recordkeeper keeps track of the amount of each participant's investments in the various options in the plan and provides each participant with a quarterly account statement. The recordkeeper often maintains a plan website or call center that participants can access to obtain information about the plan and to review their accounts. The recordkeeper may also provide access to investment education materials or investment advice. These services are largely commodities, and the market for recordkeeping services is highly competitive.

68.      Numerous recordkeepers in the marketplace are capable of providing a high level of service and will vigorously compete to win a recordkeeping contract for large defined contribution plans. These recordkeepers will readily respond to a request for proposal ("RFP") and will tailor their bids based on the desired services (*e.g.*, recordkeeping, website, call center, etc.). In light of the commoditized nature of the essential recordkeeping services, recordkeepers primarily differentiate

themselves based on price, and will aggressively bid to offer the best price in an effort to win the business.

69.    The cost of recordkeeping services depends on the number of participants (or participant accounts), not on the amount of assets in the participant's account.[9] Thus, the cost of providing recordkeeping services to a participant with a $100,000 account balance is the same for a participant with $1,000 in her retirement account. Consequently, prudent fiduciaries negotiate a fixed dollar amount for the recordkeeper's annual compensation, usually based on a rate of a fixed dollar amount per participant rather than as a percentage of assets.[10] Otherwise, as plan assets increase, such as through participant contributions or investment gains, the recordkeeping compensation increases without any change in the recordkeeping services, leading to unreasonable fees.[11]

---

[9] "[T]he actual cost of administrative services is more dependent on the number of participants in the plan." There is no "logical or practical correlation between an increase in administrative fees and an increase in plan assets." *Be a Responsible Fiduciary: Ask the Right Questions About 401(k) Plan Fees*, Hewitt Assoc. (Oct. 2008); *see also* Mercer Investment Consulting, Inc., *DC Fee Management— Mitigating Fiduciary Risk and Maximizing Plan Performance*, at 3 (2013) ("Conversely, utilizing a pricing model that is dependent on the value of plan assets arbitrarily 'builds in' fee increases that are not linked to the level or quality of the recordkeeper's services.").

[10] *Id.* ("Price administrative fees on a per-participant basis.").

[11] *Id.* ("[U]tilizing a pricing model that is dependent on the value of plan assets arbitrarily 'builds in' fee increases that are not linked to the level or quality of the recordkeeper's services.").

70.     Because of economies of scale, large plans get lower effective rates per participant than smaller plans. Plans with 100,000 participants can obtain much lower rates per participant than a plan with 1,000 participants. A study commissioned by the DOL in 1998 demonstrates these economies of scale, finding that as the number of plan participants increases, the cost per participant decreases based on bids from "major 401(k) service providers."[12]

| Number of Participants | Service Provider Cost Per Participant |
| --- | --- |
| 200 | $42 |
| 500 | $37 |
| 1,000 | $34[13] |

71.     The industry refers to plans of similar size to the Plans, with an extraordinary large number of participants, as jumbo plans. These types of plans can unquestionably obtain *significantly* even lower recordkeeping fees as set forth above.

72.     Mutual funds and other investment vehicles may agree to pay recordkeepers a percentage of fund assets to compensate for the cost of recordkeeping a plan, an arrangement called "revenue sharing." This asset-based fee is negotiated between the fund and the recordkeeper and usually is concealed. It is

---

[12] U.S. Dept. of Labor, *Study of 401(k) Plan Fees and Expenses* (1998), available at https://www.dol.gov/sites/default/files/ebsa/researchers/analysis/retirement/study-of-401k-plan-fees-and-expenses.pdf, archived at https://perma.cc/XVY9-A2LD.

[13] *Id.* at § 4.2.2 ("Recordkeeping and Administration Expenses").

designed to compensate recordkeepers for smaller plans and thus can overcompensate a recordkeeper in large plans with a large amount invested in revenue-sharing funds. Although paying for recordkeeping services with an asset-based fee is not a per se violation of ERISA, it can lead to excessive fees if not monitored and capped by the plan fiduciary.

73.     To make an informed assessment as to whether a recordkeeper is receiving no more than reasonable compensation for the services provided to a plan, prudent fiduciaries of defined contribution plans monitor *all* sources of compensation received by plan recordkeepers – including without limitation any revenue sharing or payments from managed account providers – and determine whether the compensation is reasonable for the services provided.[14]

74.     For example, recordkeepers may receive additional compensation paid by the managed account provider for providing "data connectivity" services. Data connectivity services establish and maintain the necessary technical and operational connections between the managed account provider and the plan recordkeeper. The data connection allows the managed account provider to receive from and send data

---

[14] *See* Reasonable Contract or Arrangement Under Section 408(b)(2)—Fee Disclosure, 77 Fed. Reg. 5632, 5650 (Feb. 3, 2012). ("In evaluating the reasonableness of contracts or arrangements for services, responsible plan fiduciaries have a duty to consider compensation that will be received by a covered service provider from all sources in connection with the services it provides to a covered plan pursuant to the service provider's contract or arrangement.").

to the plan recordkeeper for purposes of providing advisory services. Data connectivity services are core recordkeeping functions because they consist of transmitting participant and plan data, and implementing transactions that are traditionally done in any recordkeeping arrangement.

75. For providing these services, some recordkeepers demand a percentage of the revenue earned by the managed account provider. Others quote a fixed dollar amount and/or a fixed per-participant fee per eligible participant enrolled in the service.

76. If a fiduciary allows the recordkeeper to be compensated – in whole or in part – through asset-based fees to provide recordkeeping services, prudent fiduciaries recognize that it is critical to: (1) negotiate a fixed amount of recordkeeping compensation based on a reasonable rate per participant per year; (2) determine all revenue sharing and other sources of compensation the recordkeeper receives from plan investment options; and then (3) recover all revenue sharing payments that exceed the negotiated compensation.

77. In October 2014, retirement plan advisor Mercer advised fiduciaries on prudent practices when offering managed accounts to plan participants.[15] Mercer advised: "[S]ince the recordkeeper collects additional revenue from offering

---

[15] Mercer, *Managed Account Providers: 10 Fiduciary Considerations*, at 6 (Oct. 2014).

managed account services, the plan sponsor should evaluate this additional compensation in the context of 'reasonableness' of overall plan fees." *See also Bugielski v. AT&T Servs.*, 76 F.4th 894, 912 (9th Cir. 2023) (citing 29 C.F.R. § 2550.408b-2(a)(3)) (Plan fiduciaries "need[] to consider the compensation [the recordkeeper] receive[s] from Financial Engines … when determining whether 'no more than reasonable compensation' was paid for [the recordkeeper's] services.").

78.    Experts in the field agree that the most certain way to determine the lowest compensation that a plan must pay for the desired level of services is to put the plan's recordkeeping services out for competitive bidding on a regular basis through an RFP. Prudent fiduciaries do this at least every five years.[16] The DOL recognizes and supports this common practice.[17]

---

[16] *See* Donald Stone, *Conducting a Successful Fee Review: How to determine whether plan fees are reasonable*, Defined Contribution Insights, at 4 (Jan./Feb. 2006) (stating "most reliable way of determining whether fees the plan is paying are reasonable" is through an RFP or an RFI search process); Tyler Polk, *Is it Time for a Change? Best Practice in Retirement Plan Record Keeper Searches*, Fiduciary Investment Advisors (April 2015); John Carl, *Including Regular RFPs as Part of a Fiduciary Liability Reduction Strategy* (Jan. 8, 2019) ("The DOL assumes that plan sponsors solicit RFPs for service providers every three to five years as part of their fiduciary duty to monitor plan service providers."), available at https://www.napa-net.org/news/2019/2/including-regular-rfps-part-fiduciary-liability-reduction-strategy/, archived at https://perma.cc/2WYP-PCK5; Roger Levy, *Selecting Service Providers, Competitive Bidding, & RFP's Importance in a Fiduciary Investment Process*, InHub (May 18, 2015), available at https://401ktv.com/wp-content/uploads/2015/12/In-hub-White-Paper_Competitive-Bidding-Process-v2.pdf., archived at https://perma.cc/WH79-AY7B.

[17] U.S. Dept. of Labor, *Meeting Your Fiduciary Responsibilities*, at p. 2 (2012); Reasonable Contract or Arrangement Under Section 408(b)(2)—Fee Disclosure, 75

79.    Fiduciary360's Prudent Practices for Investment Stewards,[18] which is widely accepted as the global fiduciary standard of excellence, advised fiduciaries that they must determine "whether the fees are reasonable in light of the services provided" and "[c]onsideration is given to putting vendor contracts back out to bid every three years."[19]

80.    In a survey of plan sponsors, Cerulli Associates found in early 2012 that more than half of the plan sponsors asked indicated that they "are likely to conduct a search for [a] recordkeeper within the next two years." These RFPs were conducted even though many of the plan sponsors indicated that "they have no intention of leaving their current recordkeeper."[20]

---

FR 41600, 41625 (July 16, 2010) ("Even very large, relatively sophisticated plan sponsors shop for services only periodically, generally once every three to five years.").

[18] The *Prudent Practices for Investment Stewards* handbook defines the Global Fiduciary Standard of Excellence, initially published in April 2003, that was derived from a prior publication (*Prudent Investment Practices*) co-produced by the Foundation for Fiduciary Studies and the American Institute of Certified Public Accountants. This publication was written by Fiduciary360, the identity brand for three related entities: the Foundation for Fiduciary Studies, the Center for Fiduciary Studies, and Fiduciary Analytics. The Foundation for Fiduciary Studies defines and substantiates specific investment fiduciary practices for trustees, investment committee members, investment advisors, and investment managers and is widely used in the industry.

[19] Fiduciary360, *Prudent Practices for Investment Stewards*, Practices S-1.4, S-4.4 (2007).

[20] Cerulli Assoc., *Recordkeeper Search Activity Expected to Increase Within Next Two Years* (Jan. 8, 2013), https://www.plansponsor.com/most-recordkeeping-rfps-to-benchmark-fees/, archived at https://perma.cc/Z47L-BUNB.

**B.      The unreasonable compensation paid to the Plans' recordkeeper**

81.      Alight has been the Plans' recordkeeper since 2019. Alight was created after a series of corporate acquisitions. In 2010, Aon acquired Hewitt Associates, a provider of benefits outsourcing and administration services, including recordkeeping services. Aon's consulting arm became a new Aon subsidiary called Aon Hewitt. In 2017, Aon sold Aon Hewitt's benefits outsourcing and administration services to private-equity firms led by the Blackstone Group. That business was then rebranded as Alight.

82.      In exchange for providing recordkeeping services, including daily plan processing, coordinating disbursement with the trustee, producing participant statements, and maintaining a customer call center, Alight charged a fixed fee of $20 per participant.[21] For participant-related transactions, such as a loan initiation fee, Alight assessed a separate fee by occurrence. In total, from 2019 through 2024, Alight received $3.4 million to $4.9 million in direct compensation. Overall, the fixed fee for recordkeeping services charged by Alight, taken alone, was consistent with the competitive market rates for the same or similar recordkeeping services provided to similarly sized defined contribution plans.

---

[21] Plaintiffs do not allege that the $20 per-participant recordkeeping fee was unreasonable.

83.     However, while Alight was fully compensated for providing recordkeeping services, Alight received additional indirect compensation from Plan participant accounts (and thus, the Plans) from the Plans' managed account provider, Financial Engines. Financial Engines and Alight refer to this additional source of compensation to the recordkeeper as data connectivity fees. Defendants have allowed the Plans' recordkeeper to receive this additional source of revenue from Financial Engines since at least 2011.

84.     Alight receives *four* separate forms of indirect compensation or revenue sharing from Financial Engines: (1) $100,000 annual payment referred to as an "Advisory Maintenance Fee"; (2) an open-ended asset-based fee of 20% of the advice fee paid by Plan participants to Financial Engines and remitted to Alight annually; (3) $6 per eligible advisory participant annually; and (4) $64 per professional management member per year.[22] Allowing a recordkeeper to receive four sources of indirect compensation from the managed account provider is not common industry practice.

85.     Since Alight was retained, Defendants failed to consider *all* direct and indirect sources of revenue to Alight and determine that Alight only received

---

[22] Additionally, Alight also receives indirect compensation from DST Retirement Solutions, LLC ("DST") to facilitate rollovers of plan distributions to institutions participating in DST's rollover network. Alight receives 50–70% of the revenue DST receives from rollover institutions. Neither Ford nor Alight has disclosed the amount of revenue sharing Alight received from DST.

reasonable compensation for recordkeeping services provided to the Plan. Defendants' failure to monitor all forms of compensation paid to Alight caused the Plans to pay unreasonable fees for recordkeeping services. Defendants simply allowed Alight to receive a stream of uncapped asset-based revenue without performing a full analysis or making a reasoned decision that the revenue-sharing payments represented legitimate compensation based on the value or cost of those services. Had Defendants done so, they would not have allowed the amount of compensation Alight received and continues to receive.

86.     Neither Ford, Alight, nor Financial Engines has disclosed the total dollar amount of indirect compensation Alight received from Financial Engines. As a conservative estimate, assuming Alight receives 20% of the reported compensation from the Plans to Financial Engines in addition to the $100,000 advisory maintenance fee paid annually, Alight received additional compensation from these two sources *alone* that ranged from $2.5 million to $3.2 million annually since 2020. Factoring in this additional source of compensation resulted in Alight receiving more than ***double*** its contracted fee for providing recordkeeping services to the Plans since 2021 and approximately double its contracted fee in 2020.

| Estimated Recordkeeping Fees | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|---|
| Contracted Recordkeeping Fee | $2,466,820 | $2,581,820 | $2,625,300 | $2,666,300 | $2,730,420 | $2,763,980 |
| Indirect Compensation (Financial Engines) | $2,162,105 | $2,449,468 | $3,011,181 | $2,988,854 | $2,915,978 | $3,220,407 |
| Total Per-Participant Recordkeeping Fee | $ 37.53 | $ 38.97 | $ 42.94 | $ 42.42 | $ 41.36 | $ 43.30 |

87. The amounts listed above do not include additional indirect compensation of $6 per eligible advisory participant and $64 per professional management member per year that Alight was paid.

88. Overall, the *conservative* total of direct and estimated indirect compensation Alight received is shown in the following table relative to the contracted recordkeeping fee:

| | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|---|
| Total Compensation | $6,058,171 | $6,190,786 | $6,396,819 | $7,332,272 | $7,809,231 | $7,794,513 |
| Per-Participant Fee | $ 49.12 | $ 47.96 | $ 48.73 | $ 55.00 | $ 57.20 | $ 56.40 |
| Contracted Recordkeeping Fee | $ 20.00 | $ 20.00 | $ 20.00 | $ 20.00 | $ 20.00 | $ 20.00 |

89. As can be seen in the table, the total compensation Alight received beyond the contracted recordkeeping fee was over *200%* more, and in recent years, almost *300%* greater than the contracted recordkeeping fee.

90. The total compensation dramatically exceeded the pricing for recordkeeping services obtained by similarly sized plans. Over *20* years ago, Fidelity, as a market leader in providing recordkeeping services to defined

contribution plans, prepared a simple pricing curve for recordkeeping-only deals of its defined contribution plan clients.[23]



91.    This pricing curve was used by the district court in *Tussey v. ABB, Inc.*, No. 06-4305, 2012 U.S. Dist. LEXIS 45240 (W.D. Mo. Mar. 31, 2012), in finding that the subject 401(k) plan paid unreasonable recordkeeping fees. This curve of actual pricing of Fidelity clients illustrates that plans of similar size paid far lower recordkeeping fees.

92.    However, the cost for providing recordkeeping services has greatly declined since that time as a result of the continued extreme competition in the

---

[23] *See Tussey v. ABB, Inc.*, No. 06-4305, (W.D. Mo.), Tr. Ex. P1093 at 5.

recordkeeping market. Fidelity stipulated that the value of recordkeeping its own

401(k) plan – Fidelity Retirement Savings Plan (fka FMR LLC Profit Sharing Plan)

– declined from 2014 to 2017.[24] The recordkeeping costs and the number of

participants (from Forms 5500) for its own plan are shown below.

| Year | Participants | Per-Participant Cost |
|------|--------------|----------------------|
| 2014 | 51,049 | $21 |
| 2015 | 56,627 | $17 |
| 2016 | 57,658 | $17 |
| 2017 | 57,312 | $14 |

93.    The pricing of other large defined contribution plans further

demonstrates that Alight's total recordkeeping compensation exceeded market rates.

For instance, a fee benchmarking survey of large public defined contribution plans

with over 100,000 participants reported recordkeeping pricing ranging from

approximately $25 to $34 per participant between 2011 and 2015.[25] As of February

1, 2015, the Verizon Savings for Management Employees, with 144,579 participants

---

[24] *Moitoso v. FMR LLC*, 451 F. Supp. 3d 189, 214 (D. Mass. Mar. 27, 2020) ("The parties have stipulated that if Fidelity were a third party negotiating this fee structure at arms-length, the value of services would range from $14–$21 per person per year over the class period, and that the recordkeeping services provided by Fidelity to this Plan are not more valuable than those received by other plans of over $1,000,000,000 in assets where Fidelity is the recordkeeper."); *Moitoso v. FMR, LLC*, No. 18-12122 (D. Mass.), Dkt. 138-67 at 3–4 ("[h]ad the Plan been a third-party plan that negotiated a fixed fee for recordkeeping services at arm's length with Fidelity, it could have obtained recordkeeping services for these amounts during these periods.").

[25] Mercer, *North Carolina Supplemental Retirement Plans: Recordkeeper Fee and Service Benchmarking*, Mar. 2017, at 5, 15.

and over $20 billion in assets, paid $25 per participant for recordkeeping services.[26]

Since at least January 1, 2023, that fee has been reduced to $23 per participant for 136,315 participants and over $27.8 billion in assets.[27] And between 2015 and 2020, the Costco 401(k) Retirement Plan, with 146,329 to 184,379 participants and $11.3 to $24.2 billion in assets, paid $24 per participant – declining to $20 per participant – for recordkeeping services.[28]

94.     The cost to Alight to establish the data connection between its recordkeeping system and Financial Engines' system for data connectivity underscores the unreasonable compensation it received for recordkeeping services. The U.S. Government Accountability Office ("GAO") found that the cost to the recordkeeper to provide this service is a *one-time* cost of approximately $400,000.[29] Critically, the data connection is not client specific and is not tied to the amount of assets invested in managed accounts. It is a one-time cost to establish the data connection, with minimal maintenance costs over time.

---

[26] Verizon, *Your Investment Options in the Verizon Savings Plan*, Feb. 1, 2015, at 25.

[27] Verizon Savings Plan for Management Employees, *Important Plan and Investment-Related Information*, Nov. 2022, at 3.

[28] Costco 401(k) Retirement Plan, *Plan and Investment Disclosures* (Nov. 2014, Nov. 2015, Nov. 2016, Nov. 2017, Nov. 2018, Jan. 2020).

[29] U.S. Government Accountability Office, Report to Congressional Requesters, *401(K) PLANS: Improvements Can be Made to Better Protect Participants in Managed Accounts*, at 50 (June 2014), available at https://www.gao.gov/assets/gao-14-310.pdf (hereinafter "2014 GAO Report"), archived at https://perma.cc/H6D6-H8M8.

95.     Financial Engines admits that establishing a data connection is a one-time, non-recurring charge. "Once we have incurred this one-time, up-front cost to establish a relationship and connection with a plan provider, we are able to roll out our services for any plan sponsor of that provider."[30]

96.     Effective March 31, 2009, Hewitt Associates (Alight's predecessor) entered into a data connectivity arrangement with Financial Engines. Because the one-time fee to integrate with Financial Engines' systems occurred approximately 10 years before the Plans retained Alight as the Plans' recordkeeper, the millions in data connectivity fees represented virtually all profit for Alight. Accordingly, the payments from Financial Engines to Alight were all unnecessary and excessive.

97.     It is widely known in the industry that plan participants are not paying the actual cost for the recordkeeper to provide data connectivity services. Rather, recordkeepers have entered into exclusivity arrangements with Financial Engines to limit the number of managed account providers that could service a recordkeeper's clients. For instance, Hewitt Associates entered into a Master Services Agreement with Financial Engines whereby Financial Engines would be the "Preferred Provider" of managed account services to its clients with over 1,000 participants. Hewitt Associates agreed to exclusively promote Financial Engines to its clients and

---

[30] Financial Engines, Inc., Form 10-K (Dec. 31, 2016), available at https://www.sec.gov/Archives/edgar/data/1430592/000156459017002582/fngn-10k_20161231.htm, archived at https://perma.cc/95SQ-Z9E8.

also notify Financial Engines if one of its clients requested information on managed account services. In turn, Financial Engines agreed that it would not reduce the amount of data connectivity fees without Hewitt Associates' express consent. On information and belief, Alight entered into a similar exclusive arrangement with Financial Engines after its rebranding.

98.     Further, jumbo plans can command extremely low or free data connectivity charges for data connectivity because the size of the plans produces substantial fees to the recordkeeper. Because the Plans are among the largest plans in the country, Defendants could have easily obtained data connectivity for a minimal fee, if any fee at all. That is what prudent fiduciaries of other jumbo plans have done.

99.     For example, in April 2013, for a plan of similar size to the Plans, Bank of America offered to provide data connectivity services for managed account services at *no* additional fee to plan participants. Similarly, Teachers Insurance and Annuity Association of America (aka TIAA) provides access to managed account services by a third party for free to its large recordkeeping clients.[31] Charles Schwab

---

[31] Assurance of Discontinuance, In the Matter of Investigation by Letitia James Attorney General of the State of New York of TIAA-CREF Individual & Institutional Services LLC, Assurance No. 21-035 ¶ 38, archived at https://perma.cc/TW4P-AUSK.

also provided its large recordkeeping clients with access to managed account services for free.[32]

100.   It is evident that Defendants failed to control the excess revenue Alight received above the negotiated recordkeeping fee for the Plans. As previously indicated, prudent fiduciaries monitor *all* sources of compensation to the recordkeeper, and when the recordkeeper receives additional indirect compensation from the managed account provider that exceeds the negotiated fee, they recapture this excess compensation for the benefit of plan participants. For instance, the Boeing Company ("Boeing") negotiated with the Boeing Company Voluntary Investment Plan's recordkeeper (Conduent) to credit back *all* revenue sharing from Financial Engines to that plan or directly to plan participants since at least January 1, 2018.[33] Because Conduent rebated all revenue sharing it received from Financial Engines, it provided the same data connectivity services to Financial Engines at no cost to Boeing's participants.

101.   However, neither the Plans' Forms 5500 filed with the DOL, regulatory fee disclosures to Plan participants, nor participant account statements reflect any

---

[32] United Airlines Pilot Retirement Plan Account, *Plan Save Soar Transition Notice*, Apr. 2014, at 12, archived at https://perma.cc/EM7N-CYTE; United Airlines Pilot Retirement Account Plan Fee and Investment Notice, May 24, 2021, at 7, archived at https://perma.cc/KV4R-6FCK.

[33] The Boeing Company Voluntary Investment Plan Annual Disclosure of Fee and Investment Information 2017 Edition, at 6.

rebates of excess revenue. The estimated indirect compensation to Alight from Financial Engines also increased in 2020 and 2021, and then remained constant in subsequent years before increasing again in 2024, further indicating that Defendants have taken no action to ensure that Alight only received reasonable compensation for the recordkeeping services rendered to the Plans.

102.   It is evident that Defendants failed to solicit competitive bids through regular RFPs for Alight's recordkeeping services. This process would have enabled Defendants to identify and evaluate all sources of revenue that Alight received from the Plans' managed account provider in comparison to competing providers' bids. This competitive process would have further enabled Defendants to leverage the Plans' size to negotiate rebates of any excess revenue sharing above a reasonable recordkeeping fee from the managed account provider.

103.   The Plans' losses from unreasonable recordkeeping fees can be determined based on the total compensation Alight received in excess of its contracted fee to provide recordkeeping services to the Plans. The excess amounts from the revenue sharing payments Alight received from Financial Engines total more than $14 million from 2020 to 2024 alone. Accounting for lost investment opportunity using an S&P 500 index fund to the present, the Plans' losses are in excess of $19 million. The Plans' losses are continuing.

42

**V.      Defendants caused the Plans to pay unreasonable compensation to the Plans' managed account provider, Financial Engines.**

### A.      Managed account services and fees

104.   Managed account providers offer investment advice and professional management services to plan participants who enroll in that service. Under the managed account offering, managed account providers make investment decisions for specific participants to allocate their retirement savings among a mix of assets, commonly referred to as asset allocation. Managed account providers in 401(k) plans limit the investment options they consider to those funds selected by the plan fiduciaries in the investment lineup to create a plan participant's asset allocation.

105.   Managed account service providers, including Financial Engines and its competitors, utilize computer programs to create the plan participant's asset allocation. However, there is minimal differentiation among the algorithms used by managed account providers to create the asset allocation for participants.

106.   Plan participants can allocate any percentage of their portfolio or contributions to managed account services. Managed account providers act as fiduciaries with respect to the investment advice provided to plan participants.

107.   Managed account service providers use two types of information strategies to create asset allocations for participants. The first type of strategy is referred to as customized service, which allocates a participant's account based solely on age or other factors that are easily available from the plan's recordkeeper,

43

such as gender, income, current account balance, and current savings rate. The other strategy is referred to as personalized service, which purports to take into account additional personal information to inform asset allocations, such as risk tolerance or spousal assets.

108.   The GAO evaluated differences in the asset allocations between managed accounts offered through customized and personalized services.[34] The GAO found that even when personalized data is used, asset allocations are nearly the same (less than a 5 percent difference), or do not change, from customized services. Thus, when a plan fiduciary selects a managed account provider that charges for personalized services, participants are not getting the full value of the services for which they are paying a significantly higher fee.

109.   Without personalized information from plan participants, managed accounts are similar to other lower-cost asset allocation solutions. For example, target-date funds ("TDFs"), like managed accounts, provide simple investment portfolio decisions for plan participants by providing a managed asset allocation that is targeted to participant time horizons selected by the participant (*e.g.,* planning to retire at age 65), with a professional managing the fund's asset allocation. Indeed,

---

[34] 2014 GAO Study.

Financial Engines concedes that TDFs are potential substitutes for its managed account services.[35]

110.   Customized and personalized managed accounts often offer little to no advantage over lower-cost professionally managed funds. In August 2013, Vanguard reported that managed accounts generally perform worse than or at best equal to Vanguard's lower-cost asset allocation investment products, such as TDFs, risk-based funds, and balanced funds.[36] The GAO reported this data in the following chart below:



Figure 8: Example of Annualized Rates of Return from One Record Keeper for Different Types of Professionally Managed 401(k) Portfolios, 2007-2012, Net of Additional Fees

Source: GAO representation of Vanguard returns data.  |  GAO-14-310

---

[35] *E.g.*, Financial Engines, Inc., Form 10-K (Dec. 31, 2016), available at https://www.sec.gov/Archives/edgar/data/1430592/000156459017002582/fngn-10k_20161231.htm, archived at https://perma.cc/CVP8-LFKN.
[36] Vanguard, *Professionally Managed Allocations and the Dispersion of Participant Portfolios* (Aug. 2013).

111. The above-referenced data illustrates that managed account participants, who generally pay higher fees, obtain lower investment returns compared to lower-cost professionally managed funds, such as TDFs, which provide similar asset allocations. Accordingly, as with any investment products, prudent fiduciaries monitor the managed account providers' fees in relation to the services provided, and the performance of the managed accounts compared to lower-cost alternatives.[37] This task is critical because the primary disadvantage of managed accounts is the additional fee plan participants incur for utilizing this service.

112. All managed account fees are negotiable and subject to economies of scale. Fiduciaries of massive defined contribution plans, such as the Plans, can obtain far lower fees for managed account services than for those of smaller defined contribution plans.

113. Managed account providers charge fees through various methods: a flat fee; a capped percentage of assets under management; a tiered assets-under-management fee; an uncapped percentage of assets under management fee; or some combination of these methods. Therefore, two participants with a similar account balance but using a different provider, or a fee that was not negotiated, can pay vastly different amounts for the same service.

---

[37] Mercer, *Managed Account Providers: 10 Fiduciary Considerations*, at 6 (Oct. 2014).

114. The GAO study demonstrated the difference in fees based on the method of payment for participants with an account balance of $10,000 or $500,000.

**Table 4: Example of Variation in 401(k) Plan Managed Account Fees**

| Provider | Type of fee | Example of annual fee charged on $10,000 account balance | Example of annual fee charged on $500,000 account balance |
|---|---|---|---|
| A | Flat fee | $20 | $20 |
| B | Variable fee,[a] capped[b] | $25 | $250 |
| C | Variable fee | $10 | $500 |
| D | Variable fee, direct arrangement[c] | As low as $8 | As low as $400 |
| | Variable fee, subadvised arrangement[d] | As high as $40 | As high as $2,000 |
| E | Variable fee, tiered,[e] default[f] | As high as $35 | As high as $1,100 |
| | Variable fee, tiered, opt-in[f] | As high as $60 | As high as $2,350 |
| F | Variable fee, tiered | Averages $45-$50 | Averages $2,250-$2,500 |
| G | Variable fee, default | As low as $45 | As low as $2,250 |
| | Variable fee, opt-in | As high as $55 | As high as $2,750 |
| H | Variable fee, large plan | As low as $25 | As low as $1,250 |
| | Variable fee, small plan | As high as $100 | As high as $5,000 |

Source: GAO analysis of managed account provider case studies.  |  GAO-14-310

115. The above table demonstrates two facts: (1) that fees for managed accounts can be massive orders of magnitude higher using an asset-based variable fee; and (2) that fiduciaries must carefully examine whether the managed account provider is doing anything more for large account participants than for smaller account participants while receiving open-ended asset-based fees.

116. As shown above, there is no guarantee that a participant who pays higher fees to a provider of managed account services will obtain higher rates of return compared to a participant who pays for lower-cost professionally managed products. The GAO illustrated the effect different fees could have on a participant's managed account balance over a 20-year time horizon. For example, a participant who is charged an additional annual fee of 1 percent on their managed account

47

balance may pay approximately $13,000 more over 20 years than they would have

paid in any other investment without such additional fee.



**Figure 10: Variation in Additional Participant Fees Paid for a Managed Account Over a 20-Year Period Given Different Fee Rates**

Source: GAO analysis of information from providers and published data on managed account fees and returns.  |  GAO-14-310

117.    There are limited independent sources of comprehensive and consistent

information on competitive managed account fees charged by providers that

fiduciaries could use to compare fees across providers. Fee information provided in

managed account providers' SEC filings may also be misleading or incomplete. For

example, Financial Engines' 2020 Part 2A Form ADV states that retirement program

clients pay up to 60 basis points, and that Financial Engines may offer certain clients

discounted fees or promotional pricing.[38] (One basis point is equal to 1/100[th] of one percent.)

118.  As a result, plan fiduciaries must carefully analyze fees charged by multiple providers and diligently negotiate fees. The only reliable way for plan fiduciaries to ensure that their plan's managed account fees and services are reasonable and market competitive is to engage in a competitive bidding process through an RFP at least every five years. This process enables the fiduciaries to periodically review the product offerings of the managed account provider to compare them with the services of other providers to determine which service model best serves plan participants, and then obtain the lowest fee for the desired managed account services.

119.  In November 2017, retirement plan investment advisor Cammack Retirement Group stated that managed account service provider contract terms and fees are a major fiduciary concern and described the importance of conducting an RFP for managed account services to show a due diligence process by interviewing vendors and "test-driving" their respective products.[39]

---

[38] Financial Engines Advisors LLC, Part 2A of Form ADV: Firm Brochure, Mar. 30, 2020, at 17, 20–21.

[39] John Buckley, *Fiduciary Considerations When Adding and Reviewing Managed Accounts*, Cammack Retirement Group (Nov. 2017), available at https://cammackretirement.com/knowledge-center/insights/fiduciary-considerations-when-adding-and-reviewing-managed-accounts.

120. From the early 2000s to the present, as recordkeeping fees compressed, managed account services have been utilized more in defined contribution plans and competition for managed account services has increased. For example, as of 2019, based on Forms ADV of managed account providers that did not charge a flat rate, fees were as low as 3 basis points, compared to a low of 8 basis points in 2014, a reduction of over 50%. Since at least 2016, Financial Engines recognized the "downward pressure on fees [they] charge for services."[40] Therefore, in order to capture market conditions and negotiate current fees, fiduciaries must, and prudent fiduciaries do, regularly conduct RFPs for managed account services, as indicated, at least every five years.

### B.     The unreasonable compensation paid to the Plans' managed account provider

121. Defendants have retained Financial Engines as the Plans' managed account provider for over 15 years, dating back to at least 2011. Financial Engines charges Plan participants uncapped asset-based fees for managed account services. From 2019 to the present, Financial Engines charged the following fees based on a percentage of assets invested in managed accounts:

---

[40] Financial Engines, Inc., Form 10-K (Dec. 31, 2016), available at https://www.sec.gov/Archives/edgar/data/1430592/000156459017002582/fngn-10k_20161231.htm, archived at https://perma.cc/CVP8-LFKN.

| Tier | 2019 | 2020 | 2025 |
|---|---|---|---|
| First $100,000 | 0.40% | 0.38% | 0.32% |
| Next $150,000 | 0.30% | 0.30% | 0.30% |
| Above $250,000 | 0.20% | 0.20% | 0.20% |

122.   These fees were deducted quarterly from Plan participant accounts.

123.   From 2019 to 2024, Financial Engines received between $10.3 million and $15.6 million annually – $13.5 million yearly on average – for managed account services paid by Plan participants.

| Direct Compensation | | | | | |
|---|---|---|---|---|---|
| 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
| $10,310,526 | $11,747,339 | $14,555,905 | $14,444,272 | $14,079,891 | $15,602,037 |

124.   The Plans were a very substantial moneymaker for, and a top client of, Financial Engines based on the amount of revenue Financial Engines received for managed account services from Plan participants. For 2020, and based on Forms 5500 data filed with the DOL, the table below lists Financial Engines' top 15 revenue-producing clients by direct compensation.

| Plan Name | Compensation | Assets |
|---|---|---|
| AT&T RETIREMENT SAVINGS PLAN | $ 11,815,000 | $ 51,350,265,000 |
| FORD DEFINED CONTRIBUTION PLANS MASTER TRUST | $ 11,747,339 | $ 21,616,259,535 |
| DELTA 401(K) RETIREMENT PLAN | $ 7,303,090 | $ 14,020,366,240 |
| AMERICAN AIRLINES, INC. 401(K) PLAN | $ 7,055,467 | $ 14,139,697,901 |
| RAYTHEON SAVINGS AND INVESTMENT PLAN | $ 6,998,878 | $ 22,756,541,633 |
| MAYO 403(B) PLAN | $ 6,359,893 | $ 9,093,602,716 |
| DUKE ENERGY RETIREMENT SAVINGS PLAN | $ 5,123,754 | $ 10,017,399,000 |
| SHELL PROVIDENT FUND | $ 5,071,295 | $ 11,437,065,718 |
| COMCAST CORPORATION RETIREMENT-INVESTMENT PLAN | $ 4,143,984 | $ 14,771,373,130 |
| CISCO SYSTEMS, INC. 401(K) PLAN | $ 2,922,731 | $ 16,439,205,115 |
| PG&E CORP. RETIREMENT SAVINGS PLAN FOR UNION-REPRESENTED EMPLOYEES | $ 2,703,334 | $ 3,931,868,000 |
| PG&E CORP. RETIREMENT SAVINGS PLAN FOR UNION REPRESENTED EMPLOYEES | $ 2,695,209 | $ 3,006,548,000 |
| EXELON CORPORATION EMPLOYEE SAVINGS PLAN | $ 2,579,432 | $ 10,659,774,029 |
| SUNTRUST BANKS, INC. 401(K) PLAN | $ 2,536,700 | $ 3,761,181,739 |
| DELL INC. 401(K) PLAN | $ 2,430,478 | $ 12,867,166,000 |

125. The Plans had very substantial bargaining power to negotiate the lowest managed account fees from any provider. Industry professionals recognize that managed account providers consider two primary factors when determining managed account pricing: (1) assets under management in managed accounts; and (2) the size of the plan in terms of assets and number of participants. The third factor, which is not applicable here, is the use of managed accounts designated as a plan's Qualified Default Investment Alternative.

52

126. The Plans had a significant amount of assets under management in managed accounts based on the massive amount of managed account fees paid to Financial Engines relative to other plans. This is because the total fees paid to the managed account provider is a reliable proxy for the amount of assets under management because managed account fees are generally asset based.

127. As shown in the above-referenced table, the Plans had roughly the greatest amount of bargaining power of all of Financial Engines' clients. Although the largest plan – AT&T's plan – had over twice the amount of total plan assets than the Plans, the Plans generated approximately the same about of revenue to Financial Engines. And Raytheon's plan, despite having a greater amount of total plan assets, only generated a fraction – over 40 percent less – of the revenue to Financial Engines as the Plans.

128. From 2019 to 2024, the Plans had approximately 123,000 to 138,000 participants and $18.7 to $25.6 billion in assets. The Plans' large number of participants and vast amount of assets gave any bidding provider tremendous opportunities for future growth for their services, and thus, the Plans additional bargaining power to obtain lower fees.

129. Objective facts further indicate that Defendants caused Financial Engines to receive unreasonable compensation. Morningstar, GuidedChoice, and ProManage, LLC are direct competitors of Financial Engines in a "competitive

53

industry[.]"[41] The quality of the managed account services of each of these providers, as well as Russell Investments, is greater than or equal to those offered by Financial Engines. However, Financial Engines charged Plan participants significantly more than these providers.

130.   Based on the competitive market for managed account services for plans with hundreds of millions of dollars in assets under management, over 10,000 participants, and over $1 billion in assets, the competitive market rate for managed account services provided to the Plans would be no more than 20 bps (or a blended rate based on the average fee across a tiered fee structure). This is a conservative estimate. For plans at the very top of the market in size, the competitive rate would be lower. In contrast to the market rate, the Plans paid 27 basis points to 29 basis points during the class period – about twice the market rate.

131.   The competitive market rate for managed account services is confirmed from a survey of managed account pricing. The following tables identify the rates charged to the Plans and other plans with over $1 billion in assets and over 10,000 participants by Financial Engines (noted with FE) and managed account

---

[41] *E.g.,* Financial Engines, Inc., Form 10-K (Dec. 31, 2016), available at https://www.sec.gov/Archives/edgar/data/1430592/000156459017002582/fngn-10k_20161231.htm, archived at https://perma.cc/CVP8-LFKN.

competitors.[42] Several observations are then drawn based on this data to further support the competitive market rate.

**Ford Plan Pricing**

| Tier | Ford Plans | |
|---|---|---|
| | **2020** | **2025** |
| First $100,000 | 0.38% | 0.32% |
| Next $150,000 | 0.30% | 0.30% |
| Above $250,000 | 0.20% | 0.20% |
| **Blended Rate** | **0.29%** | **0.27%** |
| Assets | $ 21,718,845,715 | $ 23,205,659,722 |

---

[42] Source data: Forms 5500; the Boeing Company Voluntary Investment Plan Annual Disclosure of Fee and Investment Information 2017 Edition; Chevron Employee Savings Investment Plan, Participant Disclosure Notice (Jan. 2018); United Airlines Pilot Retirement Account Plan Fee and Investment Notice (May 24, 2021); 2015 Motorola Solutions Summary Plan Description (Apr. 2015); Kimberly-Clark Your 401(k) Profit Sharing Plan Summary Plan Description (Jan. 2017); McDonald's 401(k) Plan Summary Plan Description and Prospectus (Oct. 31, 2018); Advocate Health Care Network 401(k) Retirement Savings Plan Participant Fee Disclosures (Dec. 31, 2016).

**Jumbo Plan Pricing**

| Tier | Boeing (FE) 2015 | Chevron 2017 |
|---|---|---|
| First $100,000 | 0.30% | 0.30%[43] |
| Next $150,000 | 0.20% | 0.20% |
| Above $250,000 | 0.10% | 0.10% |
| **Blended Rate** | **0.20%** | **0.20%** |
| Assets | $ 47,142,842,348 | $ 19,938,525,161 |

132.   The above-referenced pricing for Boeing and Chevron was from *9* to *11* years ago. The time period that such pricing was obtained is meaningful. Managed account fees have declined since 2015. Because of the declining rates due to competition in the industry, the competitive market rate would be well below 20 basis points for a plan of similar size to the Plans since 2020.

---

[43] No fee is applied to accounts with less than $5,000.

**Smaller Plan Pricing**

| Tier | Motorola (FE) 2015 | Kimberly Clark (FE) 2017 | McDonald's 2018 | Advocate Health 2016 |
|---|---|---|---|---|
| First $100,000 | 0.35% | 0.30% | | |
| Next $150,000 | 0.25% | 0.20% | | |
| Above $250,000 | 0.10% | 0.10% | | |
| **Blended Rate** | **0.23%** | **0.20%** | **0.25%**[44] | **0.20%**[45] |
| Assets | $ 4,554,146,259 | $ 3,898,466,000 | $ 3,319,757,823 | $ 2,529,008,447 |

133.   Similar to the table identifying jumbo plan pricing, this pricing for significantly smaller plans was obtained *8* to *11* years ago. Again, the competitive environment during the class period would have yielded much lower rates for a plan of similar size to the Plans. Moreover, managed account fees are subject to economies of scale. Thus, participants in larger plans can obtain significantly lower fees than participants in smaller plans. However, plans the fraction of the Plans' size, including those that used Financial Engines, paid *significantly* less for the same or similar managed account services than the Plans. This further supports the unreasonable fees charged by Financial Engines.

---

[44] Fees are capped at $250 per participant.
[45] Fees are capped at $250 per participant.

134.   Although the Boeing plan had a greater amount of assets than the Plans, including in 2020 with over $68 billion in assets, it had significantly less bargaining power to negotiate fees than the Plans. In 2020, as indicated above, Financial Engines derived $1.3 million in revenue from its relationship with Boeing, whereas the Plans generated $11.7 million – nine times *more* revenue for the same managed account services. Thus, the Plans had much greater bargaining power to obtain lower fees than the Boeing plan yet paid higher fees.

135.   It is evident that Defendants failed to conduct a competitive bidding process through regular RFPs for the Plans' managed account services. Prior to 2020, similarly situated defined contribution plans obtained managed account pricing *far* below the fees paid by the Plans, including those plans that used Financial Engines.

136.   It is further evident that Defendants never investigated Financial Engines' growing asset-based revenue to determine the reasonableness of Financial Engines' total compensation. From 2019 through 2020, Financial Engines' total compensation increased from $10.3 million to $14.5 million – roughly a 40% increase. From 2019 to 2024, Financial Engines' compensation increased by over 50%. Financial Engines garnered millions of dollars in additional compensation even though the managed account services remained the same. Allowing a service provider's asset-based compensation to increase without a corresponding increase in

services is direct evidence of a fiduciary's failure to monitor the compensation of a service provider.

137. The specific amount of assets invested by Plan participants in managed accounts is not publicly known, and thus, Plaintiffs cannot specify the precise amount of Plan losses caused by unreasonable managed account fees. However, the Plans' losses can be initially shown from the revenue Financial Engines shared with Alight for "data connectivity" services that were excessive. The Plans' losses can also be shown after discounting the amount Financial Engines was paid by a competitive market rate. Under this method, from 2020 through 2024, and accounting for lost investment opportunity using an S&P 500 index fund to the present, the Plans' losses are in excess of $29 million. The Plans' losses are continuing.

## VI. Defendants repeatedly refused to provide statutorily required documents upon request in direct violation of ERISA.

138. Under 29 U.S.C. § 1024(b)(4) [ERISA § 104(b)(4)], a plan "administrator shall, upon written request of any participant or beneficiary, furnish a copy of the latest updated summary plan description, and the latest annual report, any terminal report, the bargaining agreement, trust agreement, contract, **or other instruments under which the plan is established or operated**." (emphasis added).

139.   A daily penalty in the amount of $110.00 is assessable for a fiduciary's failure to produce the required information within 30 days. *See* 29 U.S.C. § 1132(c)(1); 29 C.F.R. § 2575.502c-1.

140.   Ford confirmed that obligation by informing participants that they have a right to receive information about the Plans, which Ford told participants applies to "all documents governing the Plan, **including any contracts**[.]" *See, e.g.*, 2025 Salary Plan Summary Plan Description (emphasis added). Parroting ERISA's penalties, Ford notified Plan participants that "[if] you request materials from a Plan and don't receive them within 30 days, you may file suit in a federal court (in such a case, the court may require the Plan Administrator to provide the materials and pay you up to $110 a day until you receive the materials." *Id.*

141.   As noted above, and among other things, the Plans required that expenses of administration be paid by Ford "in accordance with any applicable agreements." *Id.* Plaintiffs repeatedly requested from Ford, as the Plan administrator, copies of the applicable Plan documents **and** related agreements (contracts) necessary for the establishment and operation of the Plans.

142.   Specifically, on April 7, 2025, Plaintiff Fuller sent Ford a request for documents and information regarding the Hourly Plan, including the Plan document and service provider agreements under ERISA § 104(b)(4). In direct contravention

of ERISA § 104(b)(4), Ford failed to provide the information within the required 30-day timeframe.

143.   On May 13, 2025, Plaintiff Egozi sent Ford a request for documents and information regarding the Salary Plan, including the Plan document and service provider agreements related to the operation of that Plan.

144.   Still without a response to Plaintiff Fuller's request, counsel for Messrs. Fuller and Egozi communicated with Ford's outside counsel (Jennafer M. Tryck of Gibson, Dunn & Crutcher LLP) on May 20, 2025, via email and again on June 9, 2025, inquiring about the status of Ford's statutorily required production of Plan materials. These were the second and third requests for information that is mandated by ERISA to be produced. In their June 9, 2025, communication, Plaintiffs' counsel underscored the necessity that with its production of materials, in response to Messrs. Egozi and Fuller's requests, Ford must produce the Plans' service provider contracts, which would further reveal how the Plans were operated.

145.   It was not until July 9, 2025, that Ford responded at all to Messrs. Fuller's and Egozi's requests, 93 days after Mr. Fuller sent his initial request, and 57 days after Mr. Egozi sent his initial request.

146.   Although Ford provided certain Plan documents, summary plan descriptions, and an outdated trust agreement between Ford and State Street, Ford failed to provide the requested service provider agreements and contracts that pertain

61

to the operation of the Plans. Indeed, Ford refused to even acknowledge Plaintiffs' requests for these agreements.

147. In a fourth request, on July 31, 2025, and accompanied with legal authority, Plaintiffs' counsel notified Ford's outside counsel that Ford's responses to Messrs. Egozi and Fuller's requests were deficient in that Ford failed to provide the necessary administrative services and recordkeeping agreements between Ford and its various service providers to assess Defendants' operation of the Plans and their compliance with the Plan documents. *Allinder v. Inter-City Products Corp. (USA)*, 152 F.3d 544, 549 (6th Cir. 1998); *see also Gibson v. Ford Motor Co.*, No. 18-43, 2021 U.S. Dist. LEXIS 3803, at *8–12 (W.D. Ky. Jan. 8, 2021) (relying on the Sixth Circuit's holding in *Allinder* to require disclosure of documents, noting that "courts should favor disclosure where it would help participants understand their rights"). Ford failed to respond.

148. On August 18, 2025, and still with no response from Ford, Plaintiffs, through their counsel on behalf of Messrs. Egozi and Fuller, again requested that Ford provide the necessary service provider agreements. Again, Ford did not respond.

149. On September 4, 2025, on behalf of both Messrs. Fuller and Egozi, Plaintiffs' counsel made a sixth request, again communicating with Ford's outside counsel requesting the production of the necessary service provider agreements that

would presumably shed further light on the operation of the Plans. In particular, Plaintiffs requested those agreements to gain a further understanding of the services provided and amounts paid from Plan assets, despite the unambiguous Plan language contrary to same.

150.   With no response, Plaintiffs' counsel again communicated with Ford's outside counsel on November 10, 2025, making a seventh request for the necessary service provider agreements and contracts. This time, Plaintiffs' counsel copied the relevant Regional Office of the U.S. Department of Labor, Employee Benefits Security Administration. As with all the requests, these documents must be produced under ERISA, and, separately, Ford has represented that such documents would be produced to any participant who requested them. Since the delivery of this letter, Ford still has not provided any of the requested service provider agreements.

151.   As recently as February 18, 2026, Plaintiffs' counsel delivered yet another request – the eighth – for Plan information. As of the filing of this Complaint, Ford has not responded to this request.

152.   Ford's absolute refusal to provide required Plan information under ERISA and Ford's own representations to Plaintiffs – who are current participants in the Plans – has resulted in ongoing, daily violations of ERISA § 104(b)(4), which are continuing, and for which Ford is liable. *See, e.g., Sedlack v. Braswell Servs.*

*Grp.*, 134 F.3d 219, 225–26 (4th Cir. 1998) (citing 29 U.S.C. § 1132(c)); 29 C.F.R. § 2575.502c-1.

## CLASS ACTION ALLEGATIONS

153.   29 U.S.C. § 1132(a)(2) authorizes any participant or beneficiary of the Plans to bring an action individually on behalf of the Plans to enforce a breaching fiduciary's liability to the Plans under 29 U.S.C. § 1109(a).

154.   In acting in this representative capacity and to enhance the due process protections of unnamed participants and beneficiaries of the Plans, as an alternative to direct individual actions on behalf of the Plans under 29 U.S.C. § 1132(a)(2), Plaintiffs seek to certify this action as a class action on behalf of all participants and beneficiaries of the Plans. Plaintiffs seek to certify, and to be appointed as representatives of, the following classes:

> All participants and beneficiaries of the Ford Motor Company Savings and Stock Investment Plan for Salaried Employees and the Ford Motor Company Tax-Efficient Savings Plan for Hourly Employees from April 23, 2020, through the date of judgment, excluding the Defendants.

And the following subclass:

> All participants and beneficiaries of the Ford Motor Company Savings and Stock Investment Plan for Salaried Employees and the Ford Motor Company Tax-Efficient Savings Plan for Hourly Employees who utilized the Plan's managed account services from April 23, 2020, through the date of judgment, excluding the Defendants.

64

155.   This action meets the requirements of Rule 23 and is certifiable as a class action for the following reasons:

a.      The Class and Subclass include over 100,000 members and are so large that joinder of all its members is impracticable.

b.      There are questions of law and fact common to the Class and Subclass because the Defendants owed fiduciary duties to the Plans and to all participants and beneficiaries and took the actions and omissions alleged herein as to the Plans and not as to any individual participant. Thus, common questions of law and fact include the following, without limitation: who are the fiduciaries liable for the remedies provided by 29 U.S.C. § 1109(a); whether the fiduciaries of the Plans breached their fiduciary duties to the Plans; what are the losses to the Plans resulting from each breach of fiduciary duty; and what Plan-wide equitable and other relief the court should impose in light of Defendants' breach of duty.

c.      Plaintiffs' claims are typical of the claims of the Class and Subclass because each Plaintiff was a participant during the time period at issue in this action and all participants in the Plans were harmed by Defendants' misconduct.

d.      Plaintiffs are adequate representatives of the Class and Subclass because they were participants in the Plans during the Class period, have no

65

interest that is in conflict with the Class and Subclass, are committed to the vigorous representation of the Class and Subclass, and have engaged experienced and competent attorneys to represent the Class and Subclass.

e.      Prosecution of separate actions for these breaches of fiduciary duties by individual participants and beneficiaries would create the risk of (A) inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants in respect to the discharge of their fiduciary duties to the Plan and personal liability to the Plan under 29 U.S.C. § 1109(a), and (B) adjudications by individual participants and beneficiaries regarding these breaches of fiduciary duties and remedies for the Plans would, as a practical matter, be dispositive of the interests of the participants and beneficiaries not parties to the adjudication or would substantially impair or impede those participants' and beneficiaries' ability to protect their interests. Therefore, this action should be certified as a class action under Rule 23(b)(1)(A) or (B).

156. A class action is the superior method for the fair and efficient adjudication of this controversy because joinder of all participants and beneficiaries is impracticable, the losses suffered by individual participants and beneficiaries may be small and impracticable for individual members to enforce their rights through individual actions, and the common questions of law and fact predominate over

individual questions. Given the nature of the allegations, no class member has an interest in individually controlling the prosecution of this matter, and Plaintiffs are aware of no difficulties likely to be encountered in the management of this matter as a class action. Alternatively, then, this action may be certified as a class under Rule 23(b)(3) if it is not certified under Rule 23(b)(1)(A) or (B).

157. Plaintiffs' counsel, Schlichter Bogard LLC ("Schlichter Bogard"), will fairly and adequately represent the interests of the Class and Subclass and is best able to represent the interests of Class members under Rule 23(g). Schlichter Bogard has been appointed as class counsel in over 30 other ERISA class actions regarding excessive fees in large defined contribution plans. Schlichter Bogard literally created the field of 401(k) fiduciary breach litigation, as recognized by federal courts across the United States. Courts in these cases have consistently and repeatedly recognized the firm's unparalleled success in the area of defined contribution excessive fee litigation:

- Judge Michael Ponsor of the United States District Court for the District of Massachusetts found that by securing a $30.9 million settlement, Schlichter Bogard had achieved an "outstanding result for the class," and "demonstrated extraordinary resourcefulness, skill, efficiency and determination." *Gordan v. Mass Mutual Life Ins., Co.*, No. 14-30184, Dkt. 144 at 5 (D. Mass. Nov. 3, 2016).

- As Chief Judge Michael J. Reagan of the Southern District of Illinois recognized in approving a settlement which was reached on the eve of trial after eight years of litigation, resulting in a $62 million monetary recovery and very substantial affirmative relief to benefit the Plans, the firm had shown "exceptional commitment and perseverance in

67

representing employees and retirees seeking to improve their retirement plans," and "demonstrated its well-earned reputation as a pioneer and the leader in the field" of 401(k) plan excessive fee litigation. *Abbott v. Lockheed Martin Corp.*, No. 06-701, 2015 U.S. Dist. LEXIS 93206, at *5 (S.D. Ill. July 17, 2015). The court further recognized that the law firm of "Schlichter, Bogard & Denton has had a *humongous* impact over the entire 401(k) industry, which has benefited employees and retirees throughout the entire country by bringing sweeping changes to fiduciary practices." *Id.* at *9–10 (emphasis added; internal quotations omitted).

- Judge Harold Baker of the Central District of Illinois acknowledged the significant impact of the firm's work, finding that as of 2013, the nationwide "fee reduction attributed to Schlichter, Bogard & Denton's fee litigation and the Department of Labor's fee disclosure regulations approach *$2.8 billion in annual savings* for American workers and retirees." *Nolte v. Cigna Corp.*, No. 07-2046, 2013 U.S. Dist. LEXIS 184622, at *6 (C.D. Ill. Oct. 15, 2013) (emphasis added). The court further noted: "As the preeminent firm in 401(k) fee litigation, Schlichter, Bogard & Denton has achieved unparalleled results on behalf of its clients." *Id.* at *8.

- Judge G. Patrick Murphy of Southern District of Illinois similarly recognized the work of Schlichter Bogard as exceptional:

> Schlichter, Bogard & Denton's work throughout this litigation illustrates an exceptional example of a private attorney general risking large sums of money and investing many thousands of hours for the benefit of employees and retirees. No case had previously been brought by either the Department of Labor or private attorneys against large employers for excessive fees in a 401(k) plan. Class Counsel performed substantial work[,] investigating the facts, examining documents, and consulting and paying experts to determine whether it was viable. This case has been pending since September 11, 2006. Litigating the case required Class Counsel to be of the highest caliber and committed to the interests of the participants and beneficiaries of the General Dynamics 401(k) Plans.

68

*Will v. General Dynamics Corp.*, No. 06-698, 2010 U.S. Dist. LEXIS 123349, at *8–9 (S.D. Ill. Nov. 22, 2010).

158. Other courts have made similar findings. *See, e.g.*, *George v. Kraft Foods Global, Inc.*, No. 08-3799, 2012 U.S. Dist. LEXIS 166816, at *8 (N.D. Ill. June 26, 2012) ("It is clear to the Court that the firm of Schlichter, Bogard & Denton is preeminent in the field" "and is the only firm which has invested such massive resources in this area."); *Pledger v. Reliance Tr. Co.*, No. 15-4444, 2021 U.S. Dist. LEXIS 105868, at *21 (N.D. Ga. Mar. 8, 2021) ("Class Counsel are highly experienced and recognized experts in ERISA litigation."); *Ford v. Takeda Pharms. U.S.A., Inc.*, No. 21-10090, 2023 U.S. Dist. LEXIS 93286, at *4 (D. Mass. Mar. 31, 2023) ("Schlichter Bogard & Denton's work on this case was exemplary and benefitted the Class by securing both monetary and affirmative relief."); *Beesley v. Int'l Paper Co.*, No. 06-703, 2014 U.S. Dist. LEXIS 12037, at *8 (S.D. Ill. Jan. 31, 2014) ("Litigating this case against formidable defendants and their sophisticated attorneys required Class Counsel to demonstrate extraordinary skill and determination.").

159. Schlichter Bogard handled the first full trial of an ERISA excessive fee case, resulting in a $36.9 million judgment for the plaintiffs that was affirmed in part by the Eighth Circuit, and successfully completed after two appeals with a $55 million settlement. *Tussey v. ABB, Inc.*, 746 F.3d 327 (8th Cir. 2014). In awarding

69

attorney's fees after trial, the district court concluded that "Plaintiffs' attorneys are clearly experts in ERISA litigation." *Tussey v. ABB, Inc.*, No. 06-4305, 2012 U.S. Dist. LEXIS 157428, at *10 (W.D. Mo. Nov. 2, 2012). Following remand, the district court emphasized the significant contribution Plaintiffs' attorneys have made to ERISA litigation: "Of special importance is the significant, national contribution made by the Plaintiffs whose litigation clarified ERISA standards in the context of investment fees" and "[t]he litigation educated plan administrators, the Department of Labor, the courts and retirement plan participants about the importance of monitoring recordkeeping fees and separating a fiduciary's corporate interest from its fiduciary obligations." *Tussey v. ABB, Inc.*, No. 06-4305, 2015 U.S. Dist. LEXIS 164818, at *7–8 (W.D. Mo. Dec. 9, 2015).

160.   Schlichter Bogard was also class counsel in and handled *Tibble v. Edison International*, 135 S. Ct. 1823 (2015), the first United States Supreme Court case to address the issue of excessive fees in a defined contribution plan—in which the Court held in a unanimous 9–0 decision that ERISA fiduciaries have "a continuing duty to monitor investments and remove imprudent ones[.]" *Id.* at 1829. More recently, Schlichter Bogard obtained two other unanimous victories in ERISA cases before the Supreme Court. *Hughes v. Nw. Univ.*, 595 U.S. 170 (2022); *Cunningham v. Cornell Univ.*, 640 U.S. 693 (2025). The firm has also obtained several favorable reversals of dismissal or summary judgment orders on appeal. *E.g.*,

*Johnson v. Parker-Hannifin Corp.*, 122 F.4th 205 (6th Cir. 2024); *Sacerdote v. N.Y. Univ.*, 9 F.4th 95 (2d Cir. 2021); *Sweda v. Univ. of Pa.*, 923 F.3d 320 (3d Cir. 2019); *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197 (9th Cir. 2016); *George v. Kraft Foods Global, Inc.*, 641 F.3d 786, 796 (7th Cir. 2011).

161.  The firm's work in ERISA excessive fee class actions has been featured in the New York Times, Wall Street Journal, NPR, Reuters, and Bloomberg, among many other media outlets. *See, e.g.*, Silla Brush and Lydia Beyoud, *Standing at the Gates of America's $14 Trillion Retirement Hoard*, Bloomberg Markets (Feb. / Mar. 2026); Nevin Adams, *Supremes Back Plaintiffs in Cornell ERISA Burden of Proof Standard*, NAPA (Apr. 17, 2025); Brian Anderson, *Jury Awards Pentegra MEP Participants $39 Million in ERISA Suit*, 401(k) Specialist (Apr. 24, 2025); Anne Tergesen, *The Lawyer on a Quest to Lower Your 401(k) Fees*, Wall St. J. (June 9, 2017); Anne Tergesen, *401(k) Fees, Already Low, Are Heading Lower*, Wall St. J. (May 15, 2016); Gretchen Morgenson, *A Lone Ranger of the 401(k)'s*, N.Y. Times (Mar. 29, 2014); Liz Moyer, *High Court Spotlight Put on 401(k) Plans*, Wall St. J. (Feb. 23, 2015); Floyd Norris, *What a 401(k) Plan Really Owes Employees*, N.Y. Times (Oct. 16, 2014); Sara Randazzo, *Plaintiffs' Lawyer Takes on Retirement Plans*, Wall St. J. (Aug. 25, 2015); Jess Bravin and Liz Moyer, *High Court Ruling Adds Protections for Investors in 401(k) Plans*, Wall St. J. (May 18, 2015); Mark

71

Miller, *Are 401(k) Fees Too High? The High-Court May Have an Opinion*, Reuters (May 1, 2014).

**Count I: Failure to Follow the Terms of the Plans**
**(29 U.S.C. § 1104(a)(1)(D))**

162.    Plaintiffs restate and incorporate the allegations in the preceding paragraphs.

163.    This Count is asserted against all Defendants.

164.    Defendants must discharge their fiduciary duties "in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of [ERISA]." 29 U.S.C. § 1104(a)(1)(D).

165.    Defendants breached their fiduciary duty under 29 U.S.C. § 1104(a)(1)(D) by causing the Plans to pay administrative expenses from Non-Forfeiture Plan Assets that Ford or Plan Forfeitures were obligated to pay.

166.    The Plans require (and at all times required) that "expenses of administration of the Plan, including, without limitation, Trustee fees, recordkeeping fees, disbursement fees, legal fees, and audit fees, shall be paid by the Company in accordance with any applicable agreements, or the Company may direct the Trustee

to pay any of such other expenses of administration of the Plan from amounts that have been forfeited at any time[.]" Salary Plan § 11.8 and Hourly Plan § XX.[46]

167.   The Plans gave no discretion to Defendants to diverge from these two exclusive sources to pay for these Plan administration expenses.

168.   Defendants violated this provision of the Plans by failing to have Ford or Plan Forfeitures pay the costs of Plan administration, thereby causing Plaintiffs to shoulder the burden by paying tens of millions of dollars from Non-Forfeiture Plan Assets to cover those expenses.

169.   As a direct and proximate result of Defendants' conduct, Defendants purposefully economically benefited themselves by saving millions of dollars each year at the expense of Plan participants and beneficiaries. By forcing Plan participants and beneficiaries to incur avoidable administrative expenses, Defendants caused the Plans to suffer a loss.

170.   Total Plan losses will be determined at trial after complete discovery in this case and are continuing.

171.   Each Defendant is personally liable under 29 U.S.C. § 1109(a) to make good to the Plans any losses resulting from the breaches of fiduciary duties alleged in this Count and is subject to other equitable or remedial relief as appropriate.

---

[46] The only exceptions to those expenses were certain brokerage commissions and expedited mailing fees, which are not at issue.

172. Each Defendant knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties, knew of the breach by the other Defendants, and failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each Defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. § 1105(a).

### Count II: Breach of Fiduciary Duty of Loyalty Related to Administrative Expenses
### (29 U.S.C. § 1104(a)(1)(A))

173. Plaintiffs restate and incorporate the allegations in the preceding paragraphs.

174. This Count is asserted against all Defendants.

175. Defendants must discharge their duties with respect to the Plans "solely in the interest of the participants and beneficiaries" and "for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan." 29 U.S.C. § 1104(a)(1)(A)(i)–(ii).

176. Defendants breached their duty of loyalty under 29 U.S.C. § 1104(a)(1)(A) by causing Non-Forfeiture Plan Assets to be used to pay for administrative expenses to the benefit of themselves, rather than solely in the interest of Plan participants and beneficiaries. Instead of ensuring that Ford or Plan Forfeitures paid administrative expenses, Defendants instead used their

74

discretionary power and control to use Non-Forfeiture Plan Assets to pay those administrative expenses. This conduct directly benefited Defendants by saving Ford tens of millions of dollars each year, all to the detriment of the Plans and their participants. These actions caused the Plans and their participants to incur significant losses.

177. Total Plan losses will be determined at trial after complete discovery in this case and are continuing.

178. Each Defendant is personally liable under 29 U.S.C. § 1109(a) to make good to the Plans any losses resulting from the breaches of fiduciary duties alleged in this Count and is subject to other equitable or remedial relief as appropriate.

179. Each Defendant knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties, knew of the breach by the other Defendants, and failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each Defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. § 1105(a).

**Count III: Breach of Fiduciary Duty of Prudence Related to Administrative Expenses**
**(29 U.S.C. § 1104(a)(1)(B))**

180. Plaintiffs restate and incorporate the allegations in the preceding paragraphs.

181. This Count is asserted against all Defendants.

182. Defendants must discharge their duties with respect to the Plans "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B).

183. Defendants breached their duty of loyalty under 29 U.S.C. § 1104(a)(1)(B) by causing Non-Forfeiture Plan Assets to be used to pay for administrative expenses to the benefit of themselves, rather than solely in the interest of Plan participants and beneficiaries. Instead of ensuring that Ford or Plan Forfeitures were used to pay for administrative expenses, Defendants deployed an imprudent and flawed decision-making process to favor Ford's corporate interests rather than determining what was in the best interest of Plan participants by using Non-Forfeiture Plan Assets to pay administrative expenses. These actions caused the Plans and their participants to incur significant losses.

184. Total Plan losses will be determined at trial after complete discovery in this case and are continuing.

185. Each Defendant is personally liable under 29 U.S.C. § 1109(a) to make good to the Plans any losses resulting from the breaches of fiduciary duties alleged in this Count and is subject to other equitable or remedial relief as appropriate.

186.   Each Defendant knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties, knew of the breach by the other Defendants, and failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each Defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. § 1105(a).

## Count IV: Breach of ERISA's Anti-Inurement Provision
## (29 U.S.C. § 1103(c)(1))

187.   Plaintiffs restate and incorporate the allegations in the preceding paragraphs.

188.   This Count is asserted against all Defendants.

189.   "[T]he assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purpose of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan." 29 U.S.C. § 1103(c)(1).

190.   Defendants violated 29 U.S.C. § 1103(c)(1) by using Non-Forfeiture Plan Assets to benefit Ford through the use of those Plan assets to pay Plan administrative expenses that Ford or Plan Forfeitures were obligated to pay, thereby failing to use Plan assets to benefit Plan participants.

191.   By failing to fulfill Ford's obligation to pay Plan administrative expenses from Ford's own company assets or through Plan Forfeitures, Defendants

pocketed millions of dollars each year at the expense and to the detriment of the Plans and its participants. As a result, Defendants caused the assets of the Plans to inure directly to the benefit of Ford at the expense of Plan participants.

192.   Each Defendant is personally liable under 29 U.S.C. § 1109(a) to make good to the Plans any losses resulting from the breaches of fiduciary duties alleged in this Count and is subject to other equitable or remedial relief as appropriate.

**Count V: Prohibited Transactions Related to Administrative Expenses**
**(29 U.S.C. § 1106(a)(1))**

193.   Plaintiffs restate and incorporate the allegations in the preceding paragraphs.

194.   This Count is asserted against all Defendants.

195.   Section 1106(a) prohibits transactions between a plan and a party in interest. 29 U.S.C. § 1106(a). "A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect — (A) exchange . . . of any property between the plan and a party in interest; [or] (D) transfer to, or use by or for the benefit of a party in interest, of any assets of the plan." 29 U.S.C. § 1106(a)(1).

196.   At all relevant times, Ford is a party in interest because it is a Plan fiduciary, Plan administrator, and employer of employees covered by the Plans. 29 U.S.C. § 1002(14)(A), (C). All remaining Defendants, including but not limited to

John Does 1–10, are and at all relevant times were parties in interest because they are or were Plan fiduciaries. 29 U.S.C. § 1002(14)(A).

197.   Defendants caused the Plans to use Non-Forfeiture Plan Assets to eliminate or reduce Ford's obligations to pay Plan administration expenses. Defendants therefore caused the Plans: (1) to engage in transactions they knew or should have known constituted an exchange of property (Non-Forfeiture Plan Assets) to or for the benefit of Ford to pay Plan administration expenses in violation of 29 U.S.C. § 1106(a)(1)(A); and (2) to engage in transactions that Defendants knew or should have known constituted the use of Non-Forfeiture Plan Assets for the benefit of Ford by avoiding Ford's obligations to Plan administrative expenses, all in violation of 29 U.S.C. § 1106(a)(1)(D). This prohibited conduct saved Ford millions of dollars annually by avoiding Ford's obligation to pay Plan administration expenses, all to the detriment of the Plans and their participants.

198.   As a direct result of these prohibited transactions, Defendants caused the Plans to suffer losses.

199.   Total Plan losses will be determined at trial after complete discovery in this case and are continuing.

200.   Each Defendant is personally liable under 29 U.S.C. § 1109(a) to make good to the Plans any losses resulting from the breaches of fiduciary duties alleged in this Count and is subject to other equitable or remedial relief as appropriate.

201. Each Defendant knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties, knew of the breach by the other Defendants, and failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each Defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. § 1105(a).

**Count VI: Prohibited Transactions Related to Administrative Expenses
(29 U.S.C. § 1106(b)(1)−(3))**

202. Plaintiffs restate and incorporate the allegations in the preceding paragraphs.

203. This Count is asserted against all Defendants.

204. Section 1106(b) prohibits transactions between a plan and a fiduciary. 29 U.S.C. § 1106(b). "A fiduciary with respect to a plan shall not — (1) deal with the assets of the plan in his own interest or for his own account, (2) in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries, or (3) receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan." 29 U.S.C. § 1106(b)(1)–(3).

205. Defendants were Plan fiduciaries and caused the Plans to use Non-Forfeiture Plan Assets to avoid Ford's obligations to pay Plan administration

expenses. Defendants therefore dealt with the assets of the Plan for their own interest or for Ford's own account in contravention of 29 U.S.C. § 1106(b)(1); acted in a transaction involving the Plan on behalf of a party (*i.e.*, Ford) whose interests were adverse to the interests of the Plan, its participants and beneficiaries, in contravention of 29 U.S.C. § 1106(b)(2); and received consideration for their own personal accounts from parties dealing with the Plan in connection with transactions involving the assets of the Plan in contravention of 29 U.S.C. § 1106(b)(3). This prohibited conduct saved Ford millions of dollars annually by avoiding Ford's obligation to pay Plan administration expenses to the detriment of the Plan and its participants.

206. Total Plan losses will be determined at trial after complete discovery in this case and are continuing.

207. Each Defendant is personally liable under 29 U.S.C. § 1109(a) to make good to the Plans any losses resulting from the breaches of fiduciary duties alleged in this Count and is subject to other equitable or remedial relief as appropriate.

208. Each Defendant knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties, knew of the breach by the other Defendants, and failed to make any reasonable effort under

the circumstances to remedy the breach. Thus, each Defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. § 1105(a).

## Count VII: Breach of Fiduciary Duty of Prudence for Unreasonable Recordkeeping Fees
## (29 U.S.C. § 1104(a)(1)(B))

209.   Plaintiffs restate and incorporate the allegations in the preceding paragraphs.

210.   This Count is asserted against all Defendants.

211.   Fiduciaries must consider *all* sources of compensation received by plan recordkeepers and determine whether the compensation is reasonable for the services provided. *See* Reasonable Contract or Arrangement Under Section 408(b)(2)—Fee Disclosure, 77 Fed. Reg. 5632, 5650 (July 16, 2010); *Bugielski*, 76 F.4th at 912 (citing 29 C.F.R. § 2550.408b-2(a)(3)). If a defined contribution plan overpays for recordkeeping services due to the fiduciaries' "failure to solicit bids" from other recordkeepers, the fiduciaries have breached their duty of prudence. *See George v. Kraft Foods Global, Inc.*, 641 F.3d 786, 798–99 (7th Cir. 2011). Similarly, failing to "monitor and control recordkeeping fees" and "paying excessive revenue sharing" as a result of failures to "calculate the amount the Plan was paying … through revenue sharing," to "determine whether [the recordkeeper's] pricing was competitive," and to "leverage the Plan's size to reduce fees," while allowing the

"revenue sharing to benefit" a third-party recordkeeper "at the Plan's expense" is a breach of fiduciary duties. *Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir. 2014).

212. Defendants breached their duty of prudence under 29 U.S.C. § 1104(a)(1)(B) by causing the Plans to pay unreasonable recordkeeping fees to the Plans' recordkeeper, Alight. Defendants failed to engage in a prudent process for the ongoing retention of Alight after it began receiving and continued to receive unreasonable compensation through revenue sharing payments from Financial Engines. Their process was deficient by failing to: monitor and control the amount of the revenue sharing payments received by Alight from Financial Engines; determine if the total compensation Alight received from all sources was reasonable for the services provided; obtain sufficient rebates of Alight's compensation that exceeded the negotiated and reasonable fee for recordkeeping services on behalf of the Plans or Plan participants; and solicit regular bids from competing providers considering all sources of compensation to the recordkeeper. Defendants also failed to determine whether the payments from Financial Engines to Alight were legitimate compensation for bona fide or necessary services. These actions caused Alight's total compensation to exceed a reasonable fee for the services provided.

213. Total Plan losses will be determined at trial after complete discovery in this case and are continuing.

214.    Each Defendant is personally liable under 29 U.S.C. § 1109(a) to make good to the Plans any losses resulting from the breaches of fiduciary duties alleged in this Count and is subject to other equitable or remedial relief as appropriate.

215.    Each Defendant knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties, knew of the breach by the other Defendants and failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each Defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. § 1105(a).

### Count VIII: Breach of Fiduciary Duty of Prudence for Unreasonable Managed Account Fees
### (29 U.S.C. § 1104(a)(1)(B))

216.    Plaintiffs restate and incorporate the allegations in the preceding paragraphs.

217.    Defendants breached their duty of prudence under 29 U.S.C. § 1104(a)(1)(B) by causing the Plans to pay unreasonable managed account fees to the Plans' managed account provider, Financial Engines. Defendants failed to engage in a prudent process for the ongoing retention of Financial Engines after it was engaged over 15 years ago. Their process was deficient by failing to: monitor and control asset-based compensation received by Financial Engines; determine if the total compensation Financial Engines received was reasonable for the services

84

provided after considering all relevant factors; leverage the Plans' enormous size and amount of assets under management to reduce fees; and solicit regular bids from competing providers to ensure that only reasonable fees were charged for managed account services provided to the Plans under the circumstances. These actions caused Financial Engines' compensation to exceed a reasonable fee for the services provided.

218.  Total Plan losses will be determined at trial after complete discovery in this case and are continuing.

219.  Each Defendant is personally liable under 29 U.S.C. § 1109(a) to make good to the Plans any losses resulting from the breaches of fiduciary duties alleged in this Count and is subject to other equitable or remedial relief as appropriate.

220.  Each Defendant knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties, knew of the breach by the other Defendants and failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each Defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. § 1105(a).

**Count IX: Failure to Monitor Fiduciaries**
**(29 U.S.C. § 1104(a)(1)(A)(ii))**

221.  Plaintiffs restate and incorporate the allegations in the preceding paragraphs.

222. This Count is asserted against Ford, Mmes. Robinson, Waldo, and House, and Messrs. Stone and Lawler.

223. Ford is the named fiduciary under 29 U.S.C. § 1102(a) with overall responsibility for the control, management, and administration of the Plans, and the Plan administrator under 29 U.S.C. § 1002(16)(A)(i) with exclusive responsibility and complete discretionary authority to control the operation, management, and administration of the Plans.

224. Ford created the Administration Committee by action of Ford's Chief Human Resources Officer and CFO, and delegated to the Administration Committee all discretionary authority to administer the Plans. Ford's Chief Human Resources Officer and CFO have the authority to appoint members of the Administration Committee. During the relevant period, Mmes. Robinson and Waldo served as Ford's Human Resources Officer, and Messrs. Stone and Lawler and Ms. House served as Ford's CFO. Accordingly, Ford and these individual defendants (the "Monitoring Defendants") had the fiduciary responsibility to monitor the performance of other fiduciaries, including those who may have been delegated fiduciary responsibility to administer and manage Plan assets.

225. A monitoring fiduciary must ensure that the person to whom it delegates fiduciary duties is performing its fiduciary obligations, including those with respect to the investment and holding of plan assets, and must take prompt and

86

effective action to protect the plan and participants when the delegate fails to discharge its duties.

226. The Monitoring Defendants breached their fiduciary monitoring duties by: (1) failing to monitor their appointees and delegees, to evaluate their performance, or to have a system in place for doing so, and standing idly by as the Plans suffered enormous losses as a result of their appointees' actions and omissions with respect to the Plans; (2) failing to monitor their appointees' fiduciary process, which would have alerted any prudent fiduciary to the potential breach because of the unlawful payment of Non-Forfeiture Plan Assets to pay administration expenses, instead of Ford or Plan Forfeitures paying them, and causing the Plans to pay unreasonable expenses; (3) failing to ensure that the monitored fiduciaries followed the terms of the Plans and obtained only reasonable fees for recordkeeping and managed account services; and (4) failing to remove appointees and delegees whose performance was inadequate in that they continued to violate the terms of the Plans and allow unreasonable fees to be charged to Plan participants, all to the detriment of Plan participants' retirement savings.

227. As a direct result of these breaches of fiduciary duty to monitor, the Plans suffered substantial losses. Had the Monitoring Defendants and the other delegated fiduciaries discharged their fiduciary monitoring duties prudently as described above, the Plans would not have suffered these losses.

**Count IX: Statutory Penalties for Failure to Provide Plan Information**
**(29 U.S.C. §§ 1024(b)(4), 1132(c)(1))**

228. Plaintiffs restate and incorporate the allegations in the preceding paragraphs.

229. This Count is asserted against Ford.

230. As the Plan administrator, Ford is obligated "upon written request of any participant or beneficiary, furnish a copy of the latest updated summary, plan description, and the latest annual report, any terminal report, the bargaining agreement, trust agreement, contract, or other instruments under which the plan is established or operated." 29 U.S.C. § 1024(b)(4). If Ford fails to provide the material requested within 30 days, the Court may assess a penalty against it in favor of the participant in the amount of $110 a day from the date of such failure or refusal. 29 U.S.C. § 1132(c)(l); 29 C.F.R. § 2575.502c-l.

231. Ford acknowledged that obligation informing participants that they have a right to receive information about the Plans, including "all documents governing the Plan, **including any contracts[.]**" *See, e.g.* 2025 Salary Plan Summary Plan Description (emphasis added). Parroting ERISA's penalties, Ford notified Plan participants that "[if] you request materials from a Plan and don't receive them within 30 days, you may file suit in a federal court (in such a case, the court may require the Plan Administrator to provide the materials and pay you up to $110 a day until you receive the materials." *Id.*

88

232. Despite Plaintiffs' requests, Defendants failed to timely provide governing Plan documents in violation of ERISA.

233. A "contract" or "other instrument" under which the Plans were established or operated are specific types of documents Ford is obligated to provide to Plan participants upon written request. 29 U.S.C. § 1024(b)(4); *see, e.g.*, *Kelly v. Altria Client Servs., LLC*, No. 23-725, 2024 U.S. Dist. LEXIS 241229, at *14–16 (E.D. Va. Aug. 1, 2024) (citations omitted).

234. Beginning on April 7, 2025, and May 13, 2025, Plaintiffs' counsel sent letters to Ford, as the Plan administrator, on behalf of Plaintiffs Fuller and Egozi requesting information under 29 U.S.C. § 1024(b) regarding the Plans. The requests for information were directed to Matthew Dupuis, as the Plan administrator for the Plans, located at 1 American Road, Ford WHQ, Room 612, Dearborn, Michigan 48126. This information was reported on the Plans' Forms 5500. These letters were received by Ford.

235. Plaintiffs' counsel sent follow-up correspondence to Ford's outside counsel (Jennafer M. Tryck of Gibson, Dunn & Crutcher LLP) seeking the requested Plan information, including service provider contracts. The most recent correspondence was sent on February 18, 2026.

236. Despite these repeated written requests that span nearly a full year (over 320 days), Ford has willfully refused to provide *all* statutorily required Plan

information in response to Plaintiffs Fuller's and Egozi's requests in violation of 29 U.S.C. § 1024(b)(4). Although Ford has provided certain Plan information, albeit still untimely and in violation of ERISA, Ford has failed to provide required and promised service provider contracts governing the administration of the Plans and operative Plan documents effective after 2024 (for the Salary Plan) or 2023 (for the Hourly Plan).

237.   Accordingly, Ford is liable for its violations of § 1024(b)(4) as alleged in this Count. Losses, measured from the dates Messrs. Fuller and Egozi each requested Plan materials, resulting from these violations total over $71,000.00, continue to accumulate, and will continue to accumulate until produced.

### JURY TRIAL DEMANDED

238.   Under the Seventh Amendment to the Constitution of the United States of America, and Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs demand a trial by jury on all issues so triable in this action or, alternatively, an advisory jury.

### PRAYER FOR RELIEF

239.   Plaintiffs, on behalf of the Plans and all similarly situated Plan participants and beneficiaries, respectfully request that the Court:

- find and declare that Defendants have breached their fiduciary duties under 29 U.S.C. § 1104, committed prohibited transactions under 29

90

U.S.C. § 1106, violated 29 U.S.C. § 1103(c)(1), and violated 29 U.SC. § 1024(b) as described above;

- find and adjudge that Defendants are personally liable to make good to the Plans all losses resulting from each and every ERISA violation described above, and to restore the Plans to the position they would have occupied but for the unlawful conduct alleged above;

- order Defendants to disgorge all assets and profits they secured as a direct and proximate result of each and every violation of ERISA alleged above;

- determine the method by which Plan losses under 29 U.S.C. § 1109(a) should be calculated;

- order Defendants to provide all accountings necessary to determine the amounts Defendants must make good to the Plans under § 1109(a);

- remove the fiduciaries who have breached their duties and enjoin them from future ERISA violations;

- order surcharge against Defendants and in favor of the Plans all amounts involved in each and every transaction for which such accounting reveals was improper, excessive, and/or in violation of ERISA;

- order Ford to pay statutory penalties for violations of 29 U.S.C. § 1024(b)(4);

- certify the Classes, appoint each of the Plaintiffs as a Class representatives, and appoint Schlichter Bogard as Class Counsel;

- award to Plaintiffs and the Classes their reasonable attorneys' fees and costs under 29 U.S.C. § 1132(g)(1) and the common fund doctrine;

- order the payment of pre- and post-judgment interest to the extent allowed by law; and

- grant other equitable or remedial relief as the Court deems appropriate.

May 8, 2026                                        Respectfully submitted,

/s/ Troy A. Doles
Troy A. Doles
Andrew D. Schlichter
Kurt C. Struckhoff
Kaitlin Minkler
SCHLICHTER BOGARD LLC
100 South Fourth Street, Suite 1200
St. Louis, MO 63102
Tel: (314) 621-6115
Facsimile: (314) 621-5934
aschlichter@uselaws.com
tdoles@uselaws.com
kstruckhoff@uselaws.com
jrohlf@uselaws.com
kminkler@uselaws.com

*Lead Counsel for Plaintiffs*

Heidi T. Sharp (P69641)
The Sharp Firm
43260 Garfield, Suite 280
Clinton Twp., MI 48038
Tel: (586) 226-2627
Facsimile: (586) 226-2630
heidi@sharpfirmlaw.com

*Local Counsel for Plaintiffs*